1   ANDRE BIROTTÉ JR.
    United States Attorney
2   SANDRA R. BROWN
    Assistant United States Attorney
3   Chief, Tax Division
    DARWIN THOMAS, State Bar No. 80745
4   Assistant United States Attorney
    Room 7211, Federal Building
5   300 North Los Angeles Street
    Los Angeles, CA 90012
6   Telephone: (213) 894-2740
    Fax: (213) 894-0115
7   E-mail: Darwin.Thomas@usdoj.gov

8   Attorneys for Defendant, the United States of America

9
    SHARYN M. FISK, ESQ., State Bar No. 199898
10  KURT KAWAFUCHI, ESQ., State Bar No. 110691
    BARBARA LUBIN, ESQ., State Bar No. 238283
11  Hochman Salkin Rettig Toscher & Perez, P.C.
    9150 Wilshire Boulevard, Suite 300
12  Beverly Hills, CA 90212
    Phone: (310) 281-3200
13  Fax: (310) 859-1430
    E-Mail: SF@taxlitigator.com
14
    Attorneys for Plaintiff Richard D. Bagley
15

16              UNITED STATES DISTRICT COURT

17            CENTRAL DISTRICT OF CALIFORNIA

18                    WESTERN DIVISION

19

20  RICHARD D. BAGLEY,              )  CASE NO. CV 10-483-GHK (FMOx)
                                    )
21          Plaintiff,              )  JOINT BRIEF IN SUPPORT OF AND IN
                                    )  OPPOSITION TO MOTION FOR
22      v.                          )  SUMMARY JUDGMENT FILED BY
                                    )  UNTIED STATES OF AMERICA
23  UNITED STATES OF AMERICA,       )
                                    )  AND
24          Defendant.              )
                                    )  OBJECTIONS TO EVIDENCE ATTACHED
25                                  )
                                    )
26  _____)

27

28

# TABLE OF CONTENTS

ARGUMENTS AND LAW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I.  DEFENDANT'S ISSUE NO. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

   A.  Defendant's Argument in Support of Issue No. 1 . . . . . . . . . . . . . . . 3

      1.  The Contingency Fee and Statutory Fees are Both Includible in Plaintiff's Gross Income for 2003. . . . . . . . . . . . . . . . . 3

        a.  Inclusion of Attorney's Fees in Gross Income. . . . . . . 3

        b.  Ownership of the Right to Attorney's Fees. . . . . . . . . . 7

        c.  Plaintiff's arguments. . . . . . . . . . . . . . . . . . . . . . . . 11

   B.  Plaintiff's Argument in Opposition to Issue No. 1 . . . . . . . . . . . . . 17

      1.  The American Jobs Creation Act of 2004. . . . . . . . . . . . . . 18

      2.  The Supreme Court's Decision in Commissioner v. Banks addressed whether Contingency Fees are Included in a Taxpayer's Income and Specifically Excluded Addressing the Same with respect to Statutory Fees . . . . . . . . . . . . . . . . . . 20

      3.  Under the FCA and Bagley's agreement with his Private Counsel, the Statutory Fee belonged to Bagley's Private Counsel, which is supported by the Ninth Circuit . . . . . . . . 24

II. DEFENDANT'S ISSUE NO. 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

   A.  Defendant's Argument in Support of Issue No. 2 . . . . . . . . . . . . . 26

   B.  Plaintiff's Argument in Opposition to Issue No. 2 . . . . . . . . . . . . . 32

      1.  Bagley Is Entitled to a Deduction for his Legal Expenses Under I.R.C. §162 as He Was Engaged in the Trade or Business of Being a Private Attorney General. . . . . . . . . . . . . . . . . . . 33

        a.  False Claims Act and the Trade or Business of Providing Services as a Private Attorney General . . . . . . . . . . . 34

i

b.    An Analysis Pursuant to the Treasury Regulations
         Support Bagley's Asserted Trade or Business . . . . . . . 36

         i.    Defendant's Assertion  that Bagley Provided No
               Services to Others is Erroneous . . . . . . . . . . . . 37

         ii.   Defendant's Assertion that Bagley's Private
               Counsel "did the lion's share of the work in
               bringing the case to settlement in favor of the
               Government" is Erroneous  . . . . . . . . . . . . . . . 39

         iii.  Bagley Was Much More Than A Party to a
               Complex Lawsuit . . . . . . . . . . . . . . . . . . . . . . . 41

         iv.   Defendant has Erroneously Characterized
               Bagley's Services to the *Qui Tam* Lawsuits as a
               One-time Event  . . . . . . . . . . . . . . . . . . . . . . . 42

Conclusion  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

DEFENDANT'S EVIDENTIARY OBJECTIONS . . . . . . . . . . . . . . . . . . . . 44

# TABLE OF AUTHORITIES

## FEDERAL CASES

Alderson v. US,
   718 F. Supp. 2d at 1190 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

Astrue v. Ratliff,
   560 U.S. __, 130 S. Ct. 2521 (2010) . . . . . . . . . . . . . . . . . 9, 10, 13, 14

Banaitis v. Commissioner,
   340 F.3d 1074 (9th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 22

Barajas v. United States,
   258 F.3d 1004 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . 21

Benci-Woodward v. Commissioner,
   219 F.3d 941 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . 7, 8, 23

Bingham's Trust v. Commissioner,
   325 U.S. 365 (1945) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Buckhannon Board & Care Home, Inc. v. W. Va. Department of Health &
Human Resource,
   532 U.S. 598 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Coady v. Commissioner,
   213 F.3d 1187 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Commissioner v. Banaitis,
   543 U.S. 426 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

Commissioner v. Banks,
   543 U.S. 426 (2005) . . . . . . . . . . . . . . 4, 5, 6, 11, 12, 13, 17, 21, 22, 30

Commissioner v. Banks,
   543 U.S. at 438-39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

Commissioner v. Glenshaw Glass,
   348 U.S. 426 (1955) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Commissioner v. Groetzinger,
   480 U.S. 23 (1987) . . . . . . . . . . . . . . . . . . . . 27, 28, 32, 33, 37, 38

Commissioner v. Lincoln Savings & Loan Association,
   403 U.S. 345 (1971) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Estate of Botnick v. Cathedral Healthcare System Inc.,
   352 F. Supp. 2d 530 (D. N.J. 2005) . . . . . . . . . . . . . . . . . . . . . . 11

Evans v. Jeff D.,
   475 U.S. 717 (1986) . . . . . . . . . . . . . . . . . . . . . . 7, 8, 11, 13, 14

iii

Gonter v. Hunt Valve Co.,
    510 F.3d 610 (6th Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Helvering v. Horst,
    311 U.S. 112 (1940) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Higgins v. Commissioner,
    312 U.S. 212 (1941) . . . . . . . . . . . . . . . . . . . . . . . 28, 30, 31, 32

INDOPCO, Inc. v. Commissioner,
    503 U.S. 79 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Independent Electric Supply, Inc. v. Commissioner,
    781 F.2d 724 (9th Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 36

Lucas v. Earl,
    281 U.S. 111 (1930) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Newton v. Rumery,
    480 U.S. 386 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Nickel v. Barnhart,
    205 F. Supp. 2d 1131 (C.D. Cal. 2002) . . . . . . . . . . . . . . . . . . . . . 27

Old Colony Trust Co. v. Commissioner,
    279 U.S. 716 (1929) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 23

Sinyard v. Commissioner,
    268 F.3d 756 (9th Cir. 2001) . . . . . . . . . . . . . 6, 7, 8, 15, 16, 17, 22, 23

Snyder v. United States,
    674 F.2d 1359 (10th Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

United States ex rel. Barajas v. Northrop Corp.,
    147 F.3d 905 (9th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

United States ex rel. Gibeault v. Texas Instruments Corp.,
    25 F.3d 725 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

United States ex rel. Kelly v. Boeing Co.,
    9 F.3d 743 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34, 41

United States ex rel. Milam v. University of Texas M.D. Anderson Cancer
    Ctr.,
    961 F.2d 46 (4th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

United States ex rel. Virani v. Jerry M. Lewis Truck Parts & Equipment,
    89 F.3d 574 (9th Cir. 1996), cert. denied 117 S. Ct. 945 (1996) . . 24, 25

United States v. Centennial Sav. Bank FSB,
    499 U.S. 573 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

iv

United States v. Central Bank of Denver,
    843 F.2d 1300 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

United States v. Gilmore,
    372 U.S. 39 (1963) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

United States v. Pyne,
    313 U.S. 127, 61 S. Ct. 893 (1941) . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Venegas v. Mitchell,
    495 U.S. 82 (1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 11, 13, 14, 23

Woodward v. Commissioner,
    397 U.S. 572 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

Worley v. United States,
    340 F.2d 500 (9th Cir. 1965) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

## TAX COURT CASES

Benci-Woodward v. Comm'r,
    T.C. Memo 1998-395, 1998 WL 778336 . . . . . . . . . . . . . . . . . . . . 29

Campbell v. Commissioner,
    134 T.C. 20 (2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

Ellsworth v. Commissioner,
    21 T.C.M. 145 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Grant v. Commissioner,
    84 T.C. 809 (1985), aff'd, 800 F.2d 260 (4th Cir. 1986 . . . . . . . . . . . 33

Green v. Comm'r,
    T.C. Memo 2005-250, 2005 WL 2847869, *aff'd*, 507 F.3d 857 (5th Cir.
    2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 27, 29

Guill v. Commissioner,
    112 T.C. 325 (1999) . . . . . . . . . . . . . . . . . . . 19, 20, 23, 28, 29, 32

Harrison v. Comm'r,
    T.C. Memo 1996-509 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

Kenseth v. Commissioner,
    114 T.C. 399 (2000), affd . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

O'Brien v. Commissioner,
    38 T.C. 707 (1962), affd. per curiam 319 F.2d 532 (3d Cir. 1963) . . . 23

Sinyard v. Comm'r,
    T.C. Memo 1998-364, 1998 WL 712470, *aff'd*, 268 F.3d 756 (9th Cir.
    2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Vianello v. Comm'r,
  T.C. Memo 2010-17, 2010 WL 342905 . . . . . . . . . . . . . . . . . . . . . . . . 29

Vincent v. Comm'r,
  T.C. Memo 2005-95, 2005 WL 1022953 . . . . . . . . . . . . . . . . . . . . . . . 6

**STATE CASES**

Fifield Manor v. Finston,
  54 Cal. 2d 632 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Flannery v. Prentiss,
  26 Cal. 4th 572, 28 P.3d 860 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

**FEDERAL STATUTES**

26 U.S.C. § 61 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

26 U.S.C. § 62(a)(20) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

26 U.S.C. § 162 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 27

26 U.S.C. § 212 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

28 U.S.C. § 2412(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14

28 U.S.C. § 2412(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

29 U.S.C. §§ 216(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

29 U.S.C. §§ 626(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7

31 U.S.C. § 3730 . . . . . . . . . . . . . . . . . . 2, 14, 15, 16, 21, 22, 31, 34, 35, 41

42 U.S.C. § 1983 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

42 U.S.C. § 1988 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9, 10, 14

**FEDERAL REGULATIONS**

Treas. Reg. § 1.162-17(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

Treas. Reg. §1.212-1(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

vi

1 | ANDRE BIROTTÉ JR.
  | United States Attorney
2 | SANDRA R. BROWN
  | Assistant United States Attorney
3 | Chief, Tax Division
  | DARWIN THOMAS, State Bar No. 80745
4 | Assistant United States Attorney
  | Room 7211, Federal Building
5 | 300 North Los Angeles Street
  | Los Angeles, CA 90012
6 | Telephone: (213) 894-2740
  | Fax: (213) 894-0115
7 | E-mail: Darwin.Thomas@usdoj.gov

8 | Attorneys for Defendant, the United States of America

9

10 | SHARYN M. FISK, ESQ., State Bar No. 199898
   | KURT KAWAFUCHI, ESQ., State Bar No. 110691
   | BARBARA LUBIN, ESQ., State Bar No. 238283
11 | Hochman Salkin Rettig Toscher & Perez, P.C.
   | 9150 Wilshire Boulevard, Suite 300
12 | Beverly Hills, CA 90212
   | Phone: (310) 281-3200
13 | Fax: (310) 859-1430
   | E-Mail: SF@taxlitigator.com

14

15 | Attorneys for Plaintiff Richard D. Bagley

16 | UNITED STATES DISTRICT COURT

17 | CENTRAL DISTRICT OF CALIFORNIA

18 | WESTERN DIVISION

19

20 | RICHARD D. BAGLEY,                  ) CASE NO. CV 10-483-GHK (FMOx)
                                         )
21 |        Plaintiff,                   ) JOINT BRIEF IN SUPPORT OF AND IN
                                         ) OPPOSITION TO MOTION FOR
22 |    v.                               ) SUMMARY JUDGMENT FILED BY
                                         ) UNTIED STATES OF AMERICA
23 | UNITED STATES OF AMERICA,           )
                                         ) AND
24 |        Defendant.                   )
                                         ) OBJECTIONS TO EVIDENCE ATTACHED
25 |                                     )
                                         ) The Following Documents are to be
26 |                                     ) Separately Filed, Concurrently Herewith:
                                         )
27 |                                     ) 1. NOTICE OF MOTION AND MOTION
                                         )    FOR SUMMARY JUDGMENT BY
28 |                                     )    DEFENDANT UNITED STATES.

1                            )   2.  JOINT EVIDENTIARY APPENDIX,
                                       with Declarations and Exhibits Attached.

2                            )

3                            )   3.  JOINT STATEMENT OF UNDISPUTED
                                         AND DISPUTED FACTS.

4                            )   Honorable George H. King

5                            )   <u>Motion Hearing</u>:

6                            )   Date:  March 28, 2011
                         )   Time:  9:30 a..m.

7                            )   Ctrm:  650
                                         255 E. Temple Street

8   _____ )                          Los Angeles, CA 90012

9          Defendant UNITED STATES OF AMERICA  has filed a Motion for Summary

10  Judgment, which is opposed by plaintiff Richard G. Bagley.  In accordance with the

11  Court's Order of June 8, 2010, the parties submit this "Joint Brief" which includes

12  their respective arguments in support of, and in opposition to, the Government's

13  motion.  In accordance with the Order requiring a joint brief, the Points and

14  Authorities are submitted here in the form of "Issues," which are then supported by a

15  supporting argument of the party advancing the issue, and opposed by an opposing

16  argument of the opposing party.

17

18  ARGUMENTS AND LAW

19  I.      DEFENDANT'S ISSUE NO. 1 - Whether plaintiff must include in income on

20  his 2003 U.S. Individual Income Tax Return (1) that portion of his "FCA payment"

21  (the statutory relator share award under 31 U.S.C. § 3730(d)(1)) that was paid to his

22  attorneys as a contingent fee, and (2) the FCA Statutory Fee awarded to plaintiff's

23  counsel under 31 U.S.C. § 3730(d)(1), a fee-shifting statute, which was paid directly

24  to plaintiff's attorneys by Northrop[1].

25

26

27  _____

28       [1]  Plaintiff filed the FCA lawsuit against his former employer TRW.  However,
but the time the suit was settled TRW had been acquired by Northrop.

A. <u>Defendant's Argument in Support of Issue No. 1</u>: Plaintiff must include in income for 2003 both (1) the contingency fee, and (2) the FCA Statutory Fee paid directly to plaintiff's attorneys.

On his original 2003 U.S. Individual Income Tax Return, plaintiff reported his entire FCA payment of $27,244,000 as "other income," and claimed a $9,070,520 miscellaneous itemized deduction on Schedule A for the costs and contingency fee paid to his lawyers in connection with the FCA prosecution case. Due to the manner in which Schedule A deductions were calculated in 2003, the amount of such expenses that could be deducted was first reduced by 2% of plaintiff's adjusted gross income for 2003, and his total itemized deductions were further reduced based on a formula that limited itemized deductions for persons with high adjusted gross incomes. Further, due to the size of plaintiff's income, he was also subject to the Alternative Minimum Tax ("AMT") in 2003. As a result of the limitations on allowable itemized deductions, and the application of the AMT, most of the tax benefit plaintiff would have otherwise obtained from the deductions for his attorney's fees and costs was eliminated. With respect to the FCA Statutory Fees, plaintiff neither reported this payment as income, nor claimed such fees as an itemized deduction on his original return. Plaintiff now takes the position that the contingency fee and costs paid from his relator's award are deductible as expenses incurred in carrying on a trade or business, thereby circumventing the limitations on itemized deductions and the AMT. As to the FCA Statutory Fee paid under § 3730(d)(1), plaintiff takes the alternative positions that either (1) these fees are not includible in his income, or (2) if includible in income they are also deductible as expenses incurred in carrying on a trade or business.

1. <u>The Contingency Fee and Statutory Fees are Both Includible in Plaintiff's Gross Income for 2003</u>.

a. Inclusion of Attorney's Fees in Gross Income.

Section 61 of the Internal Revenue Code defines gross income as "all income from whatever source derived." 26 U.S.C. § 61. The definition of gross income is broad in terms of what it includes, and exclusions from gross income are narrowly construed. See United States v. Centennial Sav. Bank FSB, 499 U.S. 573, 583 (1991); Comm'r v. Glenshaw Glass, 348 U.S. 426, 430 (1955). Gross income includes economic gains not otherwise specifically excluded. Comm'r v. Banks, 543 U.S. 426, 433 (2005) (citing Glenshaw Glass, 348 U.S. at 429-30).

"[T]axpayers cannot exclude economic gain from income by assigning the gain in advance to another party." Banks, 543 U.S. at 433. The rationale under this "anticipatory assignment" doctrine is "the principle that gains should be taxed 'to those who earned them'". Banks, 543 U.S. at 433-34 (quoting Lucas v. Earl, 281 U.S. 111, 114 (1930)). "The anticipatory assignment doctrine is meant to prevent taxpayers from avoiding taxation through 'arrangements and contracts however skil[l]fully devised to prevent [income] when paid from vesting even for a second in the man who earned it.'" Id. at 434 (quoting Lucas, 281 U.S. at 115).

Typically, the attribution of income in an ordinary case depends on "whether a taxpayer exercises completed dominion over the income in question." Banks, 543 U.S. at 434. See Glenshaw Glass, 348 U.S. at 431. In the context of anticipatory assignments, the question is slightly different because the "assignor often does not have dominion over the income at the moment of receipt." Banks, 543 U.S. at 434. "In that instance, the question becomes whether the assignor retains dominion over the income-generating asset, because the taxpayer 'who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants.'" Id. (quoting Helvering v. Horst, 311 U.S. 112, 116-17 (1940)). Looking at a taxpayer's control over the "income-generating asset" upholds the principle that "income should be taxed to [those] who earn[] and enjoy[] its benefits." Banks, 543 U.S. at 435. "In the case of a litigation recovery the

4

1   income-generating asset is the cause of action that derives from the plaintiff's legal

2   injury." Id. "The plaintiff retains dominion over this asset throughout the litigation."

3   Id.

4        In Banks, the Supreme Court held that as a general rule, "when a litigant's

5   recovery constitutes income, the litigant's income includes the portion of the recovery

6   paid to the attorney as a contingent fee." 543 U.S. at 430. The Court noted that "the

7   anticipatory assignment doctrine is not limited to situations when the precise dollar

8   value of the assignment is known in advance." Id. at 435. The Court determined that

9   it was "of no consequence" that the amount of income the asset would generate was

10  unknown. Id. at 436. The Court found the key determining factor was that the

11  "taxpayer retained control over the income-generating asset, diverted some of the

12  income produced to another party, and realized a benefit by doing so." Id. at 435.

13       The Banks Court also rejected the taxpayers' arguments that the attorney-client

14  relationship is some sort of business partnership or joint venture in the contingency

15  fee context for tax purposes. 543 U.S. at 436. The Court stated the attorney-client

16  relationship "is a quintessential principal-agent relationship" regardless of the

17  compensation agreement or the attorney's skill and effort. Id. Since the attorney is an

18  agent with the duty to act only in the interest of the principle, any economic gain the

19  agent realizes to fulfill that duty is income to the principal. Id. at 436-37. Therefore,

20  while the amount paid to the agent may be deductible, absent a specific statutory

21  exemption, it may not be excluded from the principal's gross income. Id. In its

22  opinion, the Banks Court noted that it did "not reach the instance where a relator

23  pursues a claim on behalf of the United States." Id. at 438. That issue had been

24  raised in an *Amicus Curiae* brief filed in Banks, but was not present in the facts in

25  Banks. See id. The Court also noted that the American Jobs Creation Act of 2004

26  redressed some taxpayer concerns in this area by permitting a taxpayer, *in computing*

27  *adjusted gross income*, to deduct attorney's fees and costs paid by or on behalf of the

28

1    taxpayer in connection with any action involving a claim of unlawful discrimination.[2]

2    Id. at 433, 439.  This change in the law in 2004 addresses the primary complaint of

3    similarly situated taxpayers, plaintiffs receiving attorney fee awards as the result of

4    litigation.  See id. at 433.  The complaint is that since the taxpayer must include the

5    fee award in income, if he or she does not get an "above the line" deduction for such

6    fees when computing adjusted gross income, the "below the line" or "itemized"

7    deduction allowed by the tax laws fails to give the taxpayer as great a benefit as an

8    "above the line" deduction.  See id. at 438-39.  However, the changes made by the

9    American Jobs Creations Act of 2004 are not retroactive to 2003 when plaintiff

10    received the FCA payment and when his attorney's fees were paid.  See id. at 433.

11        Although the Banks decision did not reach the question of whether statutory

12    fees paid to a relator's attorneys under a fee shifting statute like § 3730(d)(1) are

13    income to the relator, in a pre-Banks opinion the Ninth Circuit held that these types of

14    fees *are* income to a plaintiff whose lawsuit resulted in such an award of statutory

15    fees.  See Sinyard v. Comm'r, 268 F.3d 756, 757 (9th Cir. 2001).  Additionally, in a

16    post-Banks decision relying on the Sinyard decision, the Tax Court concluded that the

17    payment of a plaintiff's attorney's fees and costs pursuant to a fee-shifting statute

18    constitutes income to the plaintiff.  Vincent v. Comm'r, T.C. Memo. 2005-95, 2005

19    WL 1022953, at *21 (T.C. May 3, 2005).

20        In Sinyard the taxpayer received a settlement that was allocated one-third to his

21    tort injuries, one-third to his lost wages, and one third to attorney's fees recoverable

22    under 29 U.S.C. §§ 626(b) and 216(b), which the defendant paid directly to Sinyard's

23    counsel.  Sinyard, 268 F.3d at 757-58.  Sinyard did not include the attorney's fee

24    portion of the settlement in income, and the Tax Court sustained the IRS's

25    determination that the amount of attorney's fees allocable to the taxable portion of

26    Sinyard's award was income to him, and that Sinyard was entitled to a "below the

27

28        [2] Note that this is exactly the tax treatment plaintiff seeks to obtain by claiming
his attorney's fees and costs as expenses incurred in carrying on a trade or business.

1  line" miscellaneous itemized deduction for those fees. Sinyard v. Comm'r, T.C.

2  Memo. 1998-364, 1998 WL 712470, at *4-7 (T.C. Oct. 7, 1998), aff'd, 268 F.3d 756

3  (9th Cir. 2001). The Ninth Circuit affirmed the Tax Court's decision, finding that

4  when Sinyard's former employer paid Sinyard's fee obligation to his lawyers, the

5  payment "was . . . income to him[,]" Sinyard, 268 F.3d at 758, since "[t]he discharge

6  by a third person of an obligation to him is the equivalent to receipt by the person

7  taxed." Id. (quoting Old Colony Trust Co. v. Comm'r, 279 U.S. 716, 729 (1929)).

8  The fact that Sinyard "never laid hands on the money paid to the lawyers does not

9  obliterate their constructive receipt." Id. Relying on prior cases and a plain reading

10  of the Age Discrimination in Employment Act ("ADEA"), the court found that under

11  the ADEA, attorney's fees are available to prevailing plaintiffs, not plaintiff's counsel.

12  Id. at 759 (citing 29 U.S.C. § 626(b) and Evans v. Jeff D., 475 U.S. 717, 730-32

13  (1986)).

14      The Vincent case involved attorney's fees paid under the fee shifting

15  provisions in California's Fair Employment and Housing Act ("FEHA"). 2005 WL

16  1022953, at *1-2. The Tax Court began its analysis by noting that the case was

17  submitted and briefed prior to the Supreme Court's decision in Banks, and that the

18  issue before the Tax Court was the same issue explicitly not reached by the Supreme

19  Court. Id. at *5. Relying on Sinyard, however, the Tax Court held that attorney's fees

20  paid pursuant to the FEHA fee-shifting statute were income to the taxpayer. Id.

21          b.      Ownership of the Right to Attorney's Fees.

22      Under California law, "an attorney lien does not confer any ownership interest

23  upon attorneys or grant attorneys any right and power over the suits, judgments, or

24  decrees of their clients." Benci-Woodward v. Comm'r, 219 F.3d 941, 943 (9th Cir.

25  2000). Benci-Woodward involved a contingent fee agreement that gave the attorney

26  a lien on any recovery in the action. See id. at 942. The taxpayer received a damage

27  award and a portion of the award was retained by his attorney pursuant to the fee

28  agreement and the attorney's lien on the proceeds. Id. at 943. The Tax Court held

7

1    that the fees retained by the attorney were includible in the taxpayer's gross income,

2    and that while the taxpayer could claim the fees as an itemized deduction, the

3    calculation of his tax liability using the AMT caused the attorney's fees to be

4    disallowed as a tax deduction.  Id. at 943-44.  The Ninth Circuit, relying on California

5    Supreme Court precedent that holds contingent fee contracts "do not operate to

6    transfer a part of the cause of action to the attorney but only give him a lien upon his

7    client's recovery[,]" id. (quoting Fifield Manor v. Finston, 54 Cal. 2d 632, 641

8    (1960)), concluded that "in litigation an attorney conducts for a client he acquires no

9    more than a professional interest."  Id.  Relying on its prior decision in Coady v.

10   Comm'r, 213 F.3d 1187, 1190 (9th Cir. 2000), a similar case arising in Alaska, the

11   court held that contingent fees paid to a plaintiff's attorney out of the proceeds of the

12   lawsuit were includible in the plaintiff's gross income, and allowable as a

13   miscellaneous itemized deduction, subject to the 2% floor applicable to such

14   deductions, and to the AMT.  Benci-Woodward, 219 F.3d at 943-44.

15           One of the issues in Sinyard was who owned the right to an award of attorney's

16   fees under a fee-shifting statute—the plaintiff or the plaintiff's attorney.  268 F.3d at

17   758-59.  In Sinyard, the court looked to the plain language of the ADEA, which

18   provided that attorney's fees are available to the prevailing party rather than plaintiff's

19   counsel, and cited cases supporting that proposition.  See id., (citing Venegas v.

20   Mitchell, 495 U.S. 82, 87 (1990) (recognizing that fee awards belong to the prevailing

21   party under civil rights statutes); Evans v. Jeff D., 475 U.S. 717, 730-32 (1986)

22   (holding that while Congress expected fee shifting to attract competent counsel to

23   represent citizens deprived of their civil rights, it did not bestow fee awards upon

24   attorneys)).

25           In Venegas, a civil rights lawsuit under 42 U.S.C. § 1983, Venegas obtained a

26   judgment and an order awarding him attorney's fees against the defendant under

27   § 1988, but in a far smaller amount than the contingent fee Venegas had agreed to pay

28   his attorney.  495 U.S. at 85.  The court refused to disallow or reduce the contingent

8

1    fee claimed by the attorney, finding that it was reasonable. Id. at 86. The Supreme

2    Court, affirming the Ninth Circuit, held that § 1988 itself does not interfere with the

3    enforceability of a contingent fee contract, and that a plaintiff may be obligated to pay

4    a contingent fee that is greater than a court-ordered statutory fee award. Id. at 90.

5    The Court also determined that a cause of action under § 1983 belongs to the injured

6    individual. Id. at 88 (citing Newton v. Rumery, 480 U.S. 386, 395 (1987)). The

7    Court concluded that § 1988 controls what the losing defendant must pay to the civil

8    rights plaintiff, not what the plaintiff must pay to his attorney. 495 U.S. at 90.

9        Evans was also a civil rights case under 42 U.S.C. § 1988. In Evans, plaintiffs

10    entered into a settlement conditioned on plaintiffs' waiver of any claim to fees or

11    costs. 475 U.S. at 722. The "waiver" condition was challenged but upheld by the

12    district court. Id. at 722-24. The Ninth Circuit invalidated the fee waiver, id. at 724,

13    but the Supreme Court reversed that holding, finding the district court did not abuse

14    its discretion in upholding the attorney's fee waiver as necessary to secure the broad

15    injunctive relief the plaintiffs sought. Id. at 742-43. Citing to the legislative history

16    the Court said "while it is undoubtedly true that Congress expected fee shifting to

17    attract competent counsel to represent citizens deprived of their civil rights, it neither

18    bestowed fee awards upon attorneys nor rendered them nonwaivable or nonnegotiable

19    . . . ." Id. at 731-32.

20        The Supreme Court's latest statement on whether an attorney's fees award

21    belongs to the litigant or his attorney appear in Astrue v. Ratliff, 560 U.S. __, 130 S.

22    Ct. 2521 (2010), a case in which a Social Security claimant prevailed on a claim

23    against the government for benefits. 130 S. Ct. at 2524. The district court granted the

24    claimant's motion for attorney's fees of about $2,000 under the Equal Access to

25    Justice Act ("EAJA"), but the Government sought to offset the fees award against a

26    prior debt the claimant owed the Government. Id. The claimant's attorney intervened

27    to challenge the offset, claiming that the attorney's fees belong to a litigant's attorney.

28    Id. at 2525. The Supreme Court held that EAJA fee awards under 28 U.S.C.

1  § 2412(d) are payable to the litigant and subject to a Government offset to satisfy a

2  pre-existing debt the litigant owes to the United States. Id. at 2524. The Supreme

3  Court relied on the plain language of the statute, and on prior cases interpreting the

4  term "prevailing party," because § 2412(d) provides that "a court shall award to a

5  prevailing party . . . fees and other expenses . . . in any civil action . . . brought by or

6  against the United States . . . unless the court finds that the position of the United

7  States was substantially justified." Id. at 2524. The Court noted that it had "long held

8  that the term 'prevailing party' in fee statutes is a 'term of art' that refers to the

9  prevailing litigant." Id. at 2525 (citing Buckhannon Bd. & Care Home, Inc. v. W. Va.

10 Dep't of Health & Human Res., 532 U.S. 598, 603 (2001)). "This treatment reflects

11 the fact that statutes that award attorney's fees to a prevailing party are exceptions to

12 the 'American Rule' that each litigant bear his own attorney's fees." Ratliff, 130 S. Ct.

13 at 2525 (citing Buckhannon Bd. & Care Home, Inc., 532 U.S. at 602). The Court

14 further stated "[t]he fact that the statute awards to the prevailing party fees in which

15 her attorney may have a beneficial interest or a contractual right does not establish

16 that the statute 'awards' the fees directly to the attorney." Id. at 2526. "[T]he statute's

17 plain text does the opposite —it 'awards' fees to the litigant, and thus subjects them

18 to a federal offset if the litigant has outstanding federal debts." Id. at 2527.

19      In determining that fee awards under the EAJA belong to the litigant rather

20 than his attorney, the Court looked to 42 U.S.C. § 1988, because of the similar

21 language used in each statute. Id. at 2529. The Court recognized the reality that the

22 prevailing party's attorney is usually the beneficiary and ultimate recipient of a fees

23 award under § 1988, id. at 2529, and went on to say that its prior decisions under

24 § 1988 emphasized that nonstatutory (contractual and other assignment-based) rights

25 typically confer entitlement to payment upon the attorney, while the statute itself

26 confers the award upon the prevailing litigant. Id. The Court opined that these kinds

27 of arrangements would be unnecessary if the statutory language provided attorneys

28 with the right to direct payment of awards. See id. ("Hence our conclusion that 'the

10

1  party, rather than the lawyer,' . . . is 'entitled to receive the fees' . . . and that the statute

2  'controls what the losing defendant must pay, not what the prevailing plaintiff must

3  pay his lawyer[.]" (citing <u>Venegas</u>, 495 U.S. at 87; <u>Evans v. Jeff D.</u>, 475 U.S. at

4  730-32)).

5      <u>Estate of Botnick v. Cathedral Healthcare Sys. Inc.</u>, 352 F. Supp. 2d 530 (D.

6  N.J. 2005), is most similar to the instant case.  There the court determined that

7  attorney's fees in a False Claims Act case belong to the relator.  352 F. Supp. 2d at

8  531.  The case involved the question of whether a relator's claim to a percentage of

9  the Government's recovery, and his claim for attorney's fees, survived his death.  <u>Id.</u>

10 In holding that the claims did survive the relator's death, the court found that the

11 "award of attorney's fees here is not to punish a defendant, but instead is simply a

12 device fashioned by Congress to reimburse a relator for initiating an action on the

13 Government's behalf."  <u>Id.</u> at 533

14     Based on the Supreme Court's reasoning in <u>Banks</u>, 543 U.S. 426 (2005),

15 plaintiff's contingency fee payment from his FCA payment is includible in his gross

16 income.  Further, relying on <u>Banks</u> the Tax Court recently addressed whether a

17 taxpayer can exclude the contingency fee portion of a relator share under the FCA,

18 and held that it is not excludable from gross income.  <u>See Campbell v. Comm'r</u>, 134

19 T.C. 20, 26-27 (2010).  Thus, the contingency fee paid by plaintiff to his attorneys is

20 income to plaintiff.

21          c.    <u>Plaintiff's arguments</u>.

22     In his refund claim plaintiff contended the FCA Statutory Fee is not includible

23 in his income for three reasons.  First, in passing the American Jobs Creation Act of

24 2004 ("AJCA") Congress now allows an above-the-line deduction for amounts

25 attributable to attorney's fees in FCA cases.  Second, the Supreme Court specifically

26 excluded consideration of statutory fees in its holding in <u>Banks</u>.  Third, the Retainer

27 Agreement between plaintiff and counsel stated that any award of statutory attorney's

28 fees under the FCA was the sole property of his counsel.  These arguments lack merit.

1    The AJCA gives plaintiff no relief, because it was only enacted in 2004 and
2 was not made retroactive to cover the 2003 tax year. Section 703 of AJCA created an
3 above-the-line deduction for attorney's fees and costs paid by, or on behalf of, a
4 taxpayer in certain types of actions, including *qui tam* lawsuits under the FCA. See
5 26 U.S.C. § 62(a)(20). The House Conference Committee Report notes that when the
6 underlying award obtained by a litigant is includible in income, deductions for
7 expenses incurred to recover the award, including attorney's fees, are typically limited
8 because they are deducted as miscellaneous itemized deductions, subject to a 2%
9 floor and the AMT. H.R. Rep. No. 108-755, at 483-84. Section 703 of the AJCA
10 fixed this problem by providing an above-the-line deduction for attorney's fees and
11 costs in selected cases, including cases brought under the FCA. If attorney's fees
12 were not includible in income, as plaintiff contends for the FCA Statutory Fee paid to
13 his counsel by Northrop, there would have been no problem to fix, and no need for
14 Congress to enact § 62(a)(20) allowing an above-the-line deduction. The tax result is
15 the same whether the fees are included in income and then deducted "above the line,"
16 or simply omitted from income altogether.

17    Plaintiff's second reason for excluding the FCA Statutory Fee from income is
18 that the Supreme Court specifically declined to consider the taxation of statutory fees
19 in Banks. See 543 U.S. at 437-38. However, it is wrong to interpret the Court's
20 inaction in Banks as suggesting that statutory fees are not income to the litigant for
21 whom they are paid. Banks unsuccessfully argued that the application of the
22 anticipatory assignment principle would be inconsistent with the purpose of statutory
23 fee-shifting provisions, i.e., to enable plaintiffs to employ competent counsel without
24 cost to themselves if they prevail. Banks argued that due to the tax treatment of the
25 fees award, even a winning litigant could end up losing money in cases where
26 damages were substantially less than attorney's fees, such as in a civil rights case for
27 injunctive relief only. Id. at 438. The Banks Court did not address whether statutory
28 attorney's fees are includible in income because the issue was not present in the case.

12

1    <u>Id.</u> at 439.  The Court did not hold that statutory fees were excludable from gross

2    income; it simply did not reach the issue.  <u>Id.</u>  The refusal of the Court to reach this

3    issue does not suggest that the Court would have held that statutory fees are

4    excludable from a plaintiff's gross income.  Additionally, the Court noted in dicta that

5    Banks's concerns were addressed by Congress in the AJCA by creating an

6    above-the-line deduction for claims governed by many fee-shifting statutes.  <u>See id.</u>

7    Moreover, the concerns raised regarding statutory fees awards are simply a *non*

8    *sequitur* in cases brought under the FCA.  First, relators file *qui tam* lawsuits in

9    anticipation of receiving a generous relator share from the Government's recovery; the

10   relator seeks cash, not injunctive relief.  Second, it is the Government that suffers the

11   primary economic injury, not the relator.  So the concern that the plaintiff loses

12   money by being made whole simply does not arise in FCA cases where the true

13   plaintiff is the United States.  In any event, the <u>Banks</u> Court's refusal to reach the

14   issue regarding statutory fees leaves the Ninth Circuit's decision in <u>Sinyard</u>, discussed

15   below, to control the outcome in this case.

16         Plaintiff's third contention is that he does not have to include the FCA

17   Statutory Fee in income because the Retainer Agreement between himself and his

18   counsel stated that any award of statutory attorney's fees under the FCA was the sole

19   property of his counsel.  However, plaintiff must include the FCA Statutory Fee in

20   income because a statutory award of fees under the FCA's fee-shifting statute belongs

21   to the relator rather than the relator's attorney, and plaintiff retained control over any

22   award of statutory fees.

23         It is now well-settled that attorney's fees and costs awarded to a prevailing

24   plaintiff under federal fee-shifting statutes belong to the prevailing party, not the

25   party's attorney.  <u>See</u> <u>Ratliff</u>, 130 S. Ct. at 2525; <u>Evans</u>, 475 U.S. at 732 n.19;

26   <u>Venegas</u>, 495 U.S. at 86-87.  The federal fee-shifting statute in each of these cases

27   uses plain language that awards costs and fees to the prevailing party, not the party's

28   attorney.  <u>See</u> <u>Ratliff</u>, 130 S. Ct. at 2525; <u>Venegas</u>, 495 U.S. at 86-87; <u>Evans</u>, 475

1   U.S. at 732 n.19.  Likewise, the language Congress used in the FCA's fee-shifting

2   statute uses similar language awarding fees and costs to the relator, not the relator's

3   attorney.  See 31 U.S.C. § 3730(d).

4        Ratliff involved a fee-shifting statute under the Equal Access to Justice Act

5   ("EAJA") that provides, "[e]xcept as otherwise specifically provided by statute, a

6   court shall award to a prevailing party other than the United States fees and other

7   expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that

8   party in any civil action  . . .  brought by or against the United States in any court

9   having jurisdiction of that action, unless the court finds that the position of the United

10  States was substantially justified or that special circumstances make an award unjust."

11  28 U.S.C. § 2412(d)(1)(A).  See Ratliff, 130 S. Ct. at 2524.

12       Evans and Venegas involved a fee-shifting statute under the federal civil rights

13  statutes that in pertinent part provides, "[i]n any action or proceeding to enforce a

14  provision of sections 1981, 1981a, 1982, 1983, 1985, and 1986 of this title, . . . the

15  court, in its discretion, may allow the prevailing party, other than the United States, a

16  reasonable attorney's fee as part of the costs  . . . ."  42 U.S.C. § 1988.  See Venegas,

17  495 U.S. at 8; Evans, 475 U.S. at 732 n.17.  In the instant matter, the FCA's

18  fee-shifting statute, 31 U.S.C. § 3730(d)(1), in pertinent part provides:

19       "If the Government proceeds with an action brought by a person under

20       subsection (b), such person shall, subject to the second sentence of this

21       paragraph, receive at least 15 percent but not more than 25 percent of the

22       proceeds of the action or settlement of the claim, depending upon the

23       extent to which the person substantially contributed to the prosecution of

24       the action . . . .  Any payment to a person under the first . . . sentence

25       of this paragraph shall be made from the proceeds.  Any such person

26       shall also receive an amount for reasonable expenses which the court

27       finds to have been necessarily incurred, plus reasonable attorneys' fees

28

14

1    and costs. All such expenses, fees, and costs shall be awarded against the

2    defendant."  (Emphasis added.)

3    Like the fee-shifting statutes in Ratliff, Venegas, and Evans, the FCA's fee shifting

4    statute similarly awards fees and costs to the relator ("the person" or "such person"),

5    not the relator's attorney.  See id.  Had Congress wanted to bestow fees and costs

6    upon the relator's attorney, it could have done so by simply providing "the person's

7    attorney" or "such person's attorney."  Congress chose otherwise.  Here, plaintiff

8    brought suit against TRW under 31 U.S.C. § 3730(b), and TRW's successor made a

9    payment of statutory attorney's fees under § 3730(d)(1).  According to the specific

10    language of the statute, these statutory fees are to compensate the relator, which in

11    this case is the plaintiff.

12        Plaintiff's choice to give these fees to his counsel as additional compensation

13    under the Retainer Agreement is of no moment.  The fact that the FCA Statutory Fee

14    went directly to his counsel is irrelevant.  See Sinyard, 268 F.3d at 759 ("That [the

15    taxpayer] never laid hands on the money paid to the lawyers does not obliterate their

16    constructive receipt.").  Plaintiff's argument that the FCA Statutory Fee was the sole

17    property of his private counsel is incorrect.  Plaintiff did not assign his right to the

18    award of statutory fees pursuant to 31 U.S.C. § 3730(d)(1) under the Retainer

19    Agreement because he retained absolute control over the award of such fees.

20    Paragraph 8 of the Retainer Agreement, Exhibit 122, p.3, recognizes that if plaintiff is

21    successful in his qui tam lawsuit, he will receive a relator share, and it provides that

22    P&C and Luce Forward are entitled to a contingent fee from the proceeds of the

23    relator share.  Paragraph 9 of the agreement recognizes that statutory fees are

24    available under the FCA.  In Paragraph 9, Exhibit 122, p.3, plaintiff agrees that these

25    fees, if awarded, belong to his counsel.  This language constitutes a classic

26    anticipatory assignment of income under Lucas.  See 281 U.S. at 114-15.  As stated

27    above, the effect of this paragraph is simply to provide compensation to his counsel in

28    addition to that provided in the contingent fee arrangement in Paragraph 8.  Paragraph

15

1  10, Exhibit 122, p.3, merely provides that if the court were to award fees and costs

2  that were less than P&C's and Luce Forward's actual costs, plaintiff would not be

3  responsible for the difference.  Paragraph 10 also provides that "neither P&C nor

4  Luce Forward shall be required to waive any portion of their fees, costs or expenses

5  as part of a settlement."  While this is true, it has no bearing on the statutory fees

6  because under 31 U.S.C. § 3730(d)(1), the claim for attorney's fees belonged to

7  plaintiff, not his counsel.

8          Paragraph 11, Exhibit 122, p.3, of the Retainer Agreement is fatal to plaintiff's

9  case.  Paragraph 11 reveals that plaintiff maintained absolute control over the award

10  of statutory fees under 31 U.S.C. § 3730(d)(1), albeit with a substantial penalty.

11  Paragraph 11 provides that if plaintiff elects, without P&C's and Luce Forward's

12  approval, to compromise or waive a statutory fee award under § 3730(d)(1), he is

13  required to reimburse P&C and Luce Forward for their actual fees and costs out of his

14  relator share.[3]  Thus, the Retainer Agreement reveals that it was plaintiff who had

15  ultimate control over the FCA Statutory Fee award under the FCA.

16          Having determined that the FCA Statutory Fee belongs to plaintiff, it must be

17  determined whether statutory fees awarded under a fee-shifting statute are income to

18  the taxpayer litigant.  Although the Supreme Court did not reach this issue in Banks,

19  the Ninth Circuit's decision in Sinyard is dispositive of this issue here.  Sinyard

20  involved the award of attorney's fees under the ADEA's fee shifting statute, 29 U.S.C.

21  §§ 216(b) and 626(b).  268 F.3d at 757.  The ADEA bestows attorney's fees on

22  prevailing plaintiffs, not their attorneys, similar to the FCA's award of attorney's fees

23  upon the relator, not the relator's attorney.  Id. at 759.  The Ninth Circuit held that

24  these fees-fees awarded under a fee-shifting statute-are income to the prevailing

25

26          [3]  Had plaintiff waived his right to statutory fees, and assuming his private
    counsels' actual fees and costs were equal to the FCA Statutory Fee, plaintiff would

27  have had to pay his counsel both the 33% contingency fee, and an additional amount
    equal to the amount that could have been recovered as a statutory fee, both from his

28  relator's share.  In this case that would have left plaintiff with only one third of his
    relator's share award.

party, in that case, Mr. Sinyard. Id. at 758-59. No credible distinction can be made between Mr. Sinyard's and plaintiff's cases. Both parties were awarded statutory fees that were paid directly to their respective counsels. Moreover, the Tax Court has decided the precise issue that Banks did not reach. Vincent, 2005 WL 1022953, at *6. Relying on Sinyard, the Tax Court in Vincent held that an award of costs and fees to a party's attorney under California Government Code § 12965(b), a fee-shifting statute, was income to the party. Id. at *6.

Because plaintiff maintained complete control over the income producing asset (his *qui tam* claims) and the derivative statutory award of attorney's fees under the FCA, the FCA Statutory Fee award belongs to plaintiff for tax purposes and must be included in his gross income. See Banks, 543 U.S. at 434-35 ("gains should be taxed to those who earned them" and "who owns or controls the source of the income, also controls the disposition of that which he could have received himself and diverts the payment from himself to others as the means of procuring the satisfaction of his wants.").

**B.    Plaintiff's Argument in Opposition to Issue No. 1:**

In Defendant's Issue No. 1, Defendant asserts the issue of whether Bagley must include in income on his 2003 Form 1040 the Contingency Fee and the Statutory Fee awarded to his counsel under the False Claims Act (the "FCA"). Bagley has never claimed that the Contingency Fee should be excluded from his income. In fact, Bagley included the Contingency Fee in income on his original income tax return (Form 1040) [see Ex. 114, line 21], as well as on his first amended income tax return (Form 1040X) [see Ex. 115, Sch. A]. In his second amended return, Bagley also included the Contingency Fee on his schedule C, as a necessary and ordinary trade or business expense. [Ex. 129, Sch. C] Thus, Defendant's argument regarding whether the Contingency Fee should be included in Bagley's income for the 2003 tax year is irrelevant and will not be addressed by Bagley.

17

Whether the Statutory Fee awarded to Bagley's counsel under the FCA should be included in income on Bagley's 2003 tax return was raised by Bagley as an alternative argument that need only be addressed after determination of whether Bagley was engaged in a trade or business. Thus, the Statutory Fee issue **is not dispositive** of Bagley's claim for refund. However, should the Court be inclined to address this issue now, whether the Statutory Fee is includable in Bagley's income is subject to partial summary adjudication and should be adjudicated in Bagley's favor.

The Statutory Fee is not includable in Bagley's income for his 2003 tax year because: 1) Congress' did not intend for attorneys' fees received under a FCA suit to be taxable income to the *qui tam* relator; 2) the Supreme Court's holding in Commissioner v. Banks, is not applicable as the Court specifically excluded statutory fees from its holding; and 3) the Retainer Agreement between Bagley and Private Counsel specifically stated that the Statutory Fee awarded under the FCA was the sole property of Private Counsel.

1.     The American Jobs Creation Act of 2004. Bagley received his FCA award in August 2003. In October 2004, the American Jobs Creation Act ("AJCA") was enacted. Under the AJCA, I.R.C. §62 was amended to specifically provide for an above-the-line deduction for amounts attributable to attorneys' fees received by individuals, in relevant part, on account of certain claims against the United States (the "Government"), which would include claims brought under the FCA. See I.R.C. §62(a)(20). While this relief applied on a prospective basis, a well-known Senate colloquy indicates that the AJCA provision was intended to reaffirm Congress' intent regarding existing law regarding the tax treatment of attorney fees in discrimination and FCA lawsuits. The floor debate leading up to passage of the AJCA included the following:

> MR. BAUCUS: As I understand it, the case law with respect to the tax treatment of attorney's fees paid by those that receive settlements or judgments in connection with a claim of unlawful discrimination, a False Claims Act, 'Qui Tam' proceeding or similar actions is unclear and that its application was questionable as interpreted by the IRS. Further, it was

never the intent of Congress that the attorneys' fees portions of such recoveries should be included in taxable income whether for regular income or alternative minimum tax purposes.

It is the understanding of the chairman that it was the conferees' intention for Section 703 [which amended I.R.C. §62 to provide for an above-the-line deduction for attorneys' fees] to clarify the proper interpretation of the prior law, and any settlements prior to the date of enactment should be treated in a manner consistent with such intent.

MR. GRASSLEY: The Senator is correct. The conferees are acting to make it clear that attorneys' fees and costs in these cases are not taxable income, especially where the plaintiff, or in the case of a Qui Tam proceeding, the relator, never actually receives the portion of the award paid to the attorneys. Despite differing opinions by certain jurisdictions and the IRS, it is my opinion that this is the correct interpretation of the law prior to enactment of Section 703 as it will be going forward. In adopting this provision, Congress is codifying the fair and equitable policy that the tax treatment of settlements or awards made after or prior to the effective date of this provision should be the same. The courts and IRS should not treat attorneys' fees and other costs as taxable income.

As I stated in my May 12, 2004, press release summarizing this and other provisions passed by the Senate as part of S. 1637:

'Tax relief gets the headlines, but part of tax relief is tax fairness. It's clearly a fairness issue to make sure people don't have to pay income taxes on income that was never theirs in the first place. That's common sense.'

Section 703 will help in well-known cases, such as that of Cynthia Spina, an Illinois police officer that secured a settlement in a sexual discrimination case that left her owing $10,000 or more. There are literally dozens of others like her in similar situations, and *it is my strong belief that the courts and the IRS should apply the guidelines of Section 703 not only after the date of enactment, but also to settlements put in place prior to that time.*

108 Cong. Rec. S11036 (daily ed. Oct. 10, 2004) (statements of Sen. Baucus and Sen. Grassley) (emphasis added). As the Senators noted, Congress' intent regarding the treatment of attorneys' fees relating to certain lawsuits, including FCA lawsuits, was that such fees were not includible in a taxpayer's income.

Defendant asserts that if statutory fees were not includible in income, there would have been no need for Congress to enact I.R.C. §62(a)(2) allowing an above-the-line deduction. As the Conference Committee Report notes, the proper tax treatment with respect to contingent fee arrangements had been litigated and that

1   there was a conflict among the courts, thus per Senator Baucus "it was the conferees'

2   intention for Section 703 to clarify the proper interpretation of the prior law." H.R.

3   Conf. Rep. No. 108-755; 108 Cong. Rec. S11036 (daily ed. Oct. 10, 2004) (statement

4   of Sen. Baucus).  Under Defendant's position, Bagley should include into income

5   approximately $36,651,295, despite the fact that he only received $18,253,480

6   (taking into consideration the payment of the Contingency Fee).[4]  As Senator

7   Grassley stated, "It's clearly a fairness issue to make sure people don't have to pay

8   income taxes on income that was never theirs in the first place."  Id. (statement of

9   Sen. Grassley)  As addressed below, Bagley was not entitled to the Statutory Fee,

10  thus, it was not his income.

11          **2.     The Supreme Court's Decision in Commissioner v. Banks addressed
    whether Contingency Fees are Included in a Taxpayer's Income and Specifically
12  Excluded Addressing the Same with respect to Statutory Fees**

13          The Supreme Court's January 24, 2005, decision in Comm'r v. Banks and

14  Comm'r v. Banaitis, 543 U.S. 426 (2005) consolidated for briefing and argument

15  (collectively the "Banks case"), came three months after the enactment of the 2004

16  AJCA. The Supreme Court granted cert in the Banks case due to a split in the circuits

17  regarding whether attorneys' fees are included in a plaintiff's income.

18          The Supreme Court held that as a *general rule*, "when a litigant's recovery

19  constitutes income, the litigant's income includes the portion of the recovery paid to

20  the attorneys as a *contingent fee*."  Id. at 430 (emphasis added).   The Supreme Court

21  determined contingent attorneys' fees were gross income to plaintiffs in the Banks

22  case because "a contingent-fee agreement should be viewed as an anticipatory

23  assignment to the attorney of a portion of the client's income from any litigation

24  recovery."  Id. at 434.  The litigation recovery is the client's income according to the

25  _____

26          [4]  Moreover, Bagley would not receive any tax benefit from a deduction for the
    approximately $18 million in attorneys fees included in his income due to the 2%
27  floor on miscellaneous itemized deductions and the alternative minimum tax.  Also, it
    should be noted that between Bagley and his Private Counsel, the entire $36,651,295
28  has been included in gross income of a taxpayer and subject to tax.  Bagley's position
    does not leave any portion of the approximately $36 million untaxed.

1  <u>Banks</u> decision because "the cause of action derives from the plaintiff's legal injury."

2  <u>Id.</u>

3      The <u>Banks</u> logic fails in a FCA civil action because it is the Government, not

4  the *qui tam* relator, that suffers the legal injury.  "A *qui tam* relator has Article III

5  standing to sue only as a relator, on behalf of the government.  His standing is in the

6  nature of an assignee of the government's claim. . . . In a *qui tam* case, only the

7  government has a dog in the fight."  <u>United States ex rel. Barajas v. Northrop Corp.</u>,

8  147 F.3d 905, 910 (9th Cir. 1998) <u>rev'd on other grounds</u> <u>United States ex rel.</u>

9  <u>Barajas v. United States</u>, 258 F.3d 1004 (9th Cir. 2001).  Moreover, because the

10  Government is the "real party in interest," an FCA *qui tam* relator does not have the

11  "control" over an FCA case that a plaintiff has over his own cause of action.  If the

12  Government elects to intervene and proceed with a FCA suit, it is not bound by an act

13  of the *qui tam* relator, it can dismiss or settle the action notwithstanding the

14  objections of the *qui tam* relator, and it can limit the participation of the *qui tam*

15  relator in the FCA prosecution.  <u>See</u> 31 U.S.C. §§3730(c)(1), (c)(2)(A)-(C).

16      As the Supreme Court announced its holding in the <u>Banks</u> case "as a general

17  rule," it has implicitly endorsed the notion that there will be exceptions.  The

18  inclusion of *statutory* attorneys' fees in a litigant's income was specifically excluded

19  by the Court in its holding:

20      Banks brought his claims under federal statutes that authorize fee awards to prevailing plaintiffs' attorneys. He contends that application of

21      the anticipatory assignment principle would be inconsistent with the purpose of statutory fee-shifting provisions. In the federal system

22      statutory fees are typically awarded by the court under the lodestar approach and the plaintiff usually has little control over the amount

23      awarded. Sometimes, as when the plaintiff seeks only injunctive relief, or when the statute caps plaintiffs' recoveries, or when for other reasons

24      damages are substantially less than attorney's fees, court-awarded attorney's fees can exceed a plaintiff's monetary recovery. Treating the

25      fee award as income to the plaintiff in such cases, it is argued, can lead to the perverse result that the plaintiff loses money by winning the suit.

26      Furthermore, it is urged that treating statutory fee awards as income to plaintiffs would undermine the effectiveness of fee-shifting statutes in

27      deputizing plaintiffs and their lawyers to act as private attorneys general.

28

21

We need not address these claims. After Banks settled his case, the fee paid to his attorney was calculated solely on the basis of the private contingent-fee contract. There was no court-ordered fee award, nor was there any indication in Banks' contract with his attorney, or in the settlement agreement with the defendant, that the contingent fee paid to Banks' attorney was in lieu of statutory fees Banks might otherwise have been entitled to recover. Also, the amendment added by the American Jobs Creation Act redresses the concern for many, perhaps most, claims governed by fee-shifting statutes.

Comm'r v. Banks, 543 U.S. at 438-39 (citations omitted).

Defendant admits that the Banks case does not reach the question of whether statutory fees paid to a *qui tam* relator's attorneys under a fee shifting statute like 31 U.S.C. §3730(d)(1) are income to the *qui tam* relator. Thus, Defendant asserts that the Ninth Circuit's pre-Banks holding in Sinyard controls. However, Sinyard also involves the payment of a contingency fee, not a statutory fee. Sinyard v. Comm'r, 268 F.3d 756, 758-59 (9th Cir. 2001) (Sinyard's discharge of indebtedness rationale operates independently of the underlying statute); see also, Banaitis v. Comm'r, 340 F.3d 1074, 1082-83 (9th Cir. 2003) ("the case *sub judice* presents a different issue than the one we discussed in Sinyard v. Comm'r., 268 F.3d 756 (9th Cir. 2001), in which we held that a third party's discharge of a debt held by a particular plaintiff constituted income to the plaintiff.") rev'd in Comm'r v. Banaitis, 543 U.S. 426 (2005); Green v. Comm'r, 312 Fed. Appx. 929, 930 (9th Cir. 2009) unpub. opin. ("Sinyard had a contingency-fee agreement with his counsel and later settled his case, allocating a third of the settlement for payment of statutory attorneys' fees pursuant to 29 U.S.C. § 626(b). This court reasoned that the payment by the employer to the attorney satisfied Sinyard's contractual obligation and thus was income to Sinyard as a discharge of indebtedness.").

The gravamen of Sinyard, as well as several other cases cited by Defendant as support for its position, is that the taxpayer receives a discharge by a third person of an obligation. Thus, the taxpayer is enriched by such discharge and, accordingly, should be taxed for such enrichment. "Sinyard had contracted to pay Winthrop & Weinstine one-third of what he might receive in settlement. His obligation to the law

22

firm was satisfied by IDS. The payment was therefore income to him. 'The discharge by a third person of an obligation to him is equivalent to receipt by the person taxed.'" Sinyard, 268 F.3d at 758 citing Old Colony Trust Co. v. Comm'r, 279 U.S. 716, 729 (1929); see also Benci-Woodward v. Comm'r, 219 F.3d 941 (9th Cir. 2000), cert denied, 531 U.S. 1112 (2001) (case involved whether a contingent fee agreement gave the attorney a lien on any recovery in the action); Venegas v. Mitchell, 495 U.S. 82 (1990) (at issue was plaintiff's contingent fee contract); Vincent v. Comm'r, T.C. Memo. 2005-95 (attorneys' fees awarded pursuant to a fee shifting statute or regulation must be included in the gross income of the plaintiff where the awards are in lieu of contingency fee.)

Although Defendant attempts to bootstrap the Supreme Court's holding in the Banks case regarding contingency fees to statutory fees, in a Private Letter Ruling the IRS distinguished Banks and ruled that an award of attorneys' fees and costs was excludible from the litigant's gross income because the attorneys worked on the case free of charge; since the litigant never promised to pay any fees, the IRS reasoned that the attorneys' fees awarded by the court pursuant to the relevant statute were not income to the litigant. PLR 201015016, 2010 PLR LEXIS 82 (Jan. 5, 2010).

> In the context of legal services contracts (retainers), plaintiff typically agrees to pay attorneys a fee for service. The fee may be a flat fee or a contingency fee. Under either arrangement, the plaintiff has a contractual obligation to pay the attorneys' fees. If a court awards attorneys' fees to a successful plaintiff and the plaintiff uses the recovery to pay (or offset payment of) attorneys' fees, plaintiff must include the awarded attorneys' fees in gross income under § 61(a) of the Code. See Kenseth v. Commissioner, 114 T.C. 399 (2000), affd. 259 F.3d 881 (7th Cir. 2001); O'Brien v. Commissioner, 38 T.C. 707, 712 (1962), affd. per curiam 319 F.2d 532 (3d Cir. 1963). The rationale is that the taxpayer receives the benefit of the payment, i.e., an economic gain through debt satisfaction. When a third party makes a payment to satisfy a taxpayer's (plaintiff's) obligation to a creditor (retained attorney), the taxpayer realizes an economic gain includable in gross income, even if the third party pays the creditor directly and the taxpayer never receives the payment. Old Colony Trust Co. v. Commissioner, 279 U.S. 716, 49 S. Ct. 499, 73 L. Ed. 918, 1929-2 C.B. 222 (1929).

Id. at *4-5.

As addressed below, the Statutory Fee received by Bagley's Private Counsel did not discharge any indebtedness owed to the Private Counsel by Bagley. Thus, the rationale of assignment of income under the <u>Banks</u> case is not applicable to the facts of this case.

### 3. <u>Under the FCA and Bagley's agreement with his Private Counsel, the Statutory Fee belonged to Bagley's Private Counsel, which is supported by the Ninth Circuit</u>

The Statutory Fees belonged to Bagley's Private Counsel as reflected in the retainer agreement between Bagley and his Private Counsel [Ex. 122], as well as supported by the Ninth Circuit's holdings in <u>United States ex rel. Virani v. Jerry M. Lewis Truck Parts & Equip.</u>, 89 F.3d 574, 578-79 (9th Cir. 1996), *cert. denied* 117 S. Ct. 945 (1996) and <u>Flannery v. Prentiss</u>, 26 Cal. 4th 572, 28 P.3d 860 (2001) (holding that a statutory fee award is really the property of the attorney).

Statutory fees are distinguishable from other fee arrangements such as contingency fee arrangements. Statutes that provide for fees are in effect "fee shifting." In fee shifting cases, it is the court that is awarding the fee, not the client. In <u>Flannery v. Prentiss</u>, 26 Cal. 4th 572, 28 P.3d 860 (2001), the court held that a statutory fee award is really the property of the attorney. The question in <u>Flannery</u> was whether the attorney or client was entitled to fees awarded under the California Fair Employment and Housing Act. Although not a tax case, the court rejected <u>Sinyard</u> and found that, absent proof of an enforceable agreement to the contrary, the attorneys' fees belonged "to the attorneys who labored to earn them." <u>Flannery</u>, 28 P.3d at 862.

The Retainer Agreement between Bagley and the Private Counsel reflects that the Statutory Fee was the property of the Private Counsel. "BAGLEY understands that any Statutory Fee Award ordered by the Court or recovered through settlement is solely the property of P&C and Luce Forward, will be paid directly to those law firms, and in no respect belongs to BAGLEY." [<u>See</u> Ex. 122, pg 3, para. 9]. In

24

1  addition, the Private Counsel had the right to waive any portion of their statutory fee

2  and Bagley had no obligation with respect to the amount waived. Moreover, the

3  receipt of the Statutory Fee by the Private Counsel did not relieve Bagley from his

4  obligation to pay the Contingency Fee.

5      While under the Retainer Agreement Bagley had a duty to ask for statutory fees

6  under the FCA, this did not give Bagley an ownership right in the Statutory Fee.  The

7  Ninth Circuit specifically addressed this issue in Virani.  While noting that only the

8  *qui tam* relator has the power to demand that the defendant pay  attorneys' fees, the

9  Ninth Circuit stated that once the power is exercised, the attorneys' rights vest and the

10  defendant's duty becomes fixed.  Virani, 89 F.3d at 578.

11      In the qui tam arena, it is even more clear that attorneys' fees must go to
        the attorneys rather than to the plaintiff. If they did not, a wrong would

12      be perpetrated upon the government. See United States ex rel. Gibeault
        v. Texas Instruments Corp., 25 F.3d 725 (9th Cir. 1994). If the amount

13      went to the plaintiff, it would be a compensatory payment which really
        belongs to the United States subject to allocation of a portion to the

14      plaintiff. Id. at 728. As we have said:

15

16      'The government claims the $ 300,000 payment for attorneys' fees is
        really a settlement under the False Claims Act that is structured as

17      attorneys' fees. Such an allocation of the settlement proceeds would
        contravene the requirements of § 3730(d)(2), which guarantees the

18      government a substantial portion of any False Claims Act settlement.

19      . . . .

20      . . . Thus, the government has a genuine concern as to whether the
        amount labelled attorneys' fees actually represents in part a payment to

21      the qui tam plaintiff. Id.'

22  Id.  In reaching this conclusion, the Ninth Circuit noted that a plaintiff is not entitled

23  to keep the fees that are measured by and paid on account of the attorneys' services.

24  Id. at 577; cf Gonter v. Hunt Valve Co., 510 F.3d 610 (6th Cir. 2007) (attorneys have

25  standing to sue regarding FCA statutory fees).

26      Further, the Retainer Agreement stated that if Bagley elects *without the*

27  *approval* of his Private Counsel to compromise or waive the Statutory Fee, or refuses

28  to seek such an award, Bagley shall reimburse his Counsel for the amount of such

25

1  fees. [Ex. 122, pg. 3, para. 11]  However, Bagley is not discharging a debt under this

2  provision.  Rather it is a means for recovery of damages should Bagley interfere with

3  his Counsel's right to the statutory fees.  In fact, the amended Retainer Agreement

4  specifically provided that the Statutory Fees is the "sole" property of his Counsel and

5  if the Counsel choose to compromise the amount (with no permission from Bagley to

6  do so), Bagley would not be liable for any shortfall.

7         For the reasons stated above, Bagley is entitled to partial summary adjudication

8  on the issue of whether the Statutory Fees are includible in Bagley's income for the

9  2003 tax year.

10  II.      DEFENDANT'S ISSUE NO. 2 - Whether plaintiff's expenses for attorney's fees

11  and costs are deductible under 26 U.S.C. § 162 on Schedule C as trade or business

12  expenses, or under 26 U.S.C. § 212(1) as Schedule A miscellaneous itemized

13  deductions for expenses incurred in the collection or production of income.

14         A.  Defendant's Argument in Support of Issue No. 2:  The Contingency Fee,

15  FCA Statutory Fee, and Costs are Properly Deducted Under § 212(1) on Schedule A

16  as Miscellaneous Itemized Deductions Because Plaintiff's Status as a Litigant in the

17  FCA Prosecution Case Does Not Constitute Carrying on a Trade or Business.

18         The only real issue in this case is whether plaintiff's activities in pursuing the

19  FCA Prosecution Case constituted carrying on a trade or business.[5]  The only reason

20  this is now an issue is because plaintiff will receive a better tax advantage if he can

21  deduct his legal fees and costs as § 162(a) business expenses when calculating

22  adjusted gross income, rather than as itemized deductions under § 212(1).  Thus,

23  since only technical tax computations are involved in this dispute, it is disingenuous

24  for plaintiff to declare that in 1994 he decided to "shift [his] career objective and

25

26         [5]  While plaintiff asserts an alternative position with respect to the FCA
   Statutory Fee award, i.e., that it was not income to him, even when it is determined
27  that the FCA Statutory Fee award was income to plaintiff there would still be no tax
   consequence to him if he sustains his claim that his attorneys' fees are deductible as
28  an expense incurred in carrying on a trade or business.

                                        26

1  pursue a business venture prosecuting TRW under the False Claims Act" (Ex. 130,
2  ¶ 7), when he waited until 2007, with the filing of his second amended 2003 tax
3  return, to actually claim he had been engaged in a "business venture" those many
4  years before.[6] His claim of his intent in 1994 to enter into a "business venture" is
5  further disproved by the fact that he did not make his "trade or business" claim on his
6  original 2003 tax return, which he prepared himself in October 2004 (Ex. 114, p.2),
7  even though his lawyers had suggested such a claim in a letter sent to plaintiff seven
8  months earlier in March of that year (Ex. 124, p.2, last paragraph). All that is
9  involved in this case are tax computations which are distasteful to plaintiff. The truth
10  is that plaintiff's "career" change and "business venture" only came about in 2007
11  when he decided to pursue his tax refund claim against the Government.

12    Section 162(a) of the Internal Revenue Code allows as a deduction "all the
13  ordinary and necessary expenses paid or incurred during the taxable year in carrying
14  on any trade or business". 26 U.S.C. § 162(a); Comm'r v. Lincoln Savings & Loan
15  Ass'n, 403 U.S. 345, 352 (1971); INDOPCO, Inc. v. Comm'r, 503 U.S. 79, 85 (1992).
16  The Supreme Court has stated that to be engaged in a "trade or business" for purposes
17  of § 162, the taxpayer must be involved in the activity with continuity and regularity,
18  and the taxpayer's primary purpose for engaging in the activity must be for income or
19  profit. Comm'r v. Groetzinger, 480 U.S. 23, 35 (1987). However, continuous and
20  regular activities pursued with a motive to collect income do not alone constitute
21  being in a trade or business. See Green v. Comm'r, T.C. Memo. 2005-250, 2005 WL
22  2847869 (T.C. Oct. 31, 2005), aff'd, 507 F.3d 857 (5th Cir. 2007). Whether a
23  taxpayer is carrying on a trade or business "requires an examination of the facts in
24
25  _____
26  [6] The fact that plaintiff only made his "trade or business" claim on a second
   amended return filed in 2007is relevant to whether he considered the prosecution of
27  the *qui tam* actions to be a trade or business. Cf. Nickel v. Barnhart, 205 F. Supp. 2d
   1131, 1141 (C.D. Cal. 2002) (individual's filing of amended tax returns is a relevant
28  fact in determining whether she was engaged in a trade or business and eligible to
   receive disability insurance benefits from the Social Security Administration).

27

1    each case." <u>Groetzinger</u>, 480 U.S. at 36 (quoting <u>Higgins v. Comm'r</u>, 312 U.S. 212,

2    217 (1941).

3        Section 212 provides that, in the case of an individual, a deduction is allowed

4    for the ordinary and necessary expenses paid or incurred during the taxable year

5    (1) for the production or collection of income; (2) for the management, conservation,

6    or maintenance of property held for the production of income; or (3) in connection

7    with the determination, collection, or refund of any tax.  26 U.S.C. § 212.  Treasury

8    Regulation § 1.212-1(d) provides in pertinent part that an expense "must bear a

9    reasonable and proximate relation to the production or collection of taxable income or

10    to the management, conservation, or maintenance of property held for the production

11    of income."  Treas. Reg. § 1.212-1(d).

12        In <u>Guill v. Comm'r</u>, 112 T.C. 325 (1999), the United States Tax Court

13    succinctly explained the deductibility of legal expenses as trade or business expenses

14    (§ 162), or as expenses for the production of income (§ 212).  112 T.C. at 328-29.

15    Section 162(a) "allows an individual to deduct all of the ordinary and necessary

16    expenses of carrying on his or her trade or business" and thus "governs the

17    deductibility of litigation costs as a business expense."  <u>Id.</u> at 328.  Section 212

18    "governs the deductibility of litigation costs as an itemized deduction when the costs

19    are incurred as a *nonbusiness profit-seeking* expense."  <u>Id.</u> (emphasis added).

20    Sections 162(a) and 212 are "considered in pari materia, except for the fact that the

21    income-producing activity of the former section is a trade or business, whereas the

22    income-producing activity of the latter section is a pursuit of investing or other

23    profitmaking that lacks the regularity and continuity of a business."  <u>Id.</u> (citing

24    <u>Woodward v. Comm'r</u>, 397 U.S. 572, 575 n.3 (1970); <u>United States v. Gilmore</u>, 372

25    U.S. 39, 44-45 (1963); <u>Bingham's Trust v. Comm'r</u>, 325 U.S. 365, 374-75 (1945).)

26        It may be more advantageous for an individual to deduct litigation costs under

27    section 162(a) rather than section 212.  <u>Guill</u>, 112 T.C. at 328.  "The primary

28    advantage of a deduction under section 162(a), vis-a-vis a deduction under section

1  212, rests on each deduction's effect on gross income and adjusted gross income." Id.

2  "A deduction under section 162(a) [may be] subtracted [in full] from gross income to

3  arrive at adjusted gross income." Id. at 329. "A deduction under section 212 is

4  subtracted from adjusted gross income to arrive at taxable income and is subject to

5  certain floor limitations described in section 67(a)." Id. "The benefit from a

6  deduction of litigation costs under § 212 may also be limited by application of the

7  Alternative Minimum Tax and § 68, which limits the total allowable amount for

8  itemized deductions." Id. (citing § 56(b) and Benci-Woodward v. Comm'r, T.C.

9  Memo. 1998-395, 1998 WL 778336, at *3 (T.C. Nov. 9, 1998)).

10      Plaintiff was not in a "trade or business" within the customary meaning of those

11  terms.  In Green v. Comm'r, T.C. Memo. 2005-250, 2005 WL 2847869 (T.C. Oct. 31,

12  2005), aff'd, 507 F.3d 857 (5th Cir. 2007), the taxpayer formed an entity whose only

13  purpose was to collect a judgment.  2005 WL 2847869, at *6.  In its analysis, the Tax

14  Court reasoned that "[a]lthough a trade or business requires continuous and regular

15  activity, continuity and regularity, do not, standing alone, constitute a trade or

16  business." Id. at *13.  The Tax Court found that even though the taxpayer

17  continuously and regularly engaged in the activity, the activity did not constitute a

18  trade or business within the customary meaning of those terms because the taxpayer

19  did not perform services for others and had no customers.  Id.  Also, the activity was

20  not one of the two recognized exceptions for businesses that do not perform services

21  or have customers-trading of securities and gambling. Id.  See also Vianello v.

22  Comm'r, T.C. Memo. 2010-17, 2010 WL 342905, at *6 (T.C. Feb. 1, 2010)

23  (recognizing that the "business of trading securities or gambling on a regular and

24  continuous basis" constitutes carrying on a "trade or business") .

25      Plaintiff's activities were not those of a person engaged in a trade or business.

26  He hired two law firms to represent him in pursuing the FCA Prosecution Case.  His

27  lawyers, along with the attorneys representing the Government, did the lion's share of

28  the work in bringing the case to a settlement in favor of the Government. Plaintiff is

1    not a lawyer, nor was he "in the business" of prosecuting his lawsuit.  The lawyers he
2    hired were the lawyers with a real client (plaintiff).  It is plaintiff's lawyers, not
3    plaintiff, who carried on a trade or business in prosecuting plaintiff's case.  In
4    Comm'r v. Banks, 543 U.S. 426, 433 (2005), the Supreme Court rejected the
5    taxpayer's arguments that the attorney-client relationship is some sort of business
6    partnership or joint venture in the contingency fee context for tax purposes.  543 U.S.
7    at 436.  Plaintiff's litigation activity was self-serving, much like that of investors
8    seeking to claim business expense deductions for self-serving activity.  See Higgins,
9    312 U.S. at 218 (finding that keeping records and collecting interests and dividends
10   from securities investments did not constitute carrying on a "trade or business,"
11   notwithstanding the continuous and regular activity).

12        Plaintiff was no more than a party to a complex lawsuit. His income arose from
13   a cause of action for damages against TRW that he undertook on behalf of the United
14   States.  A chose in action is a property interest.  See Worley v. United States, 340
15   F.2d 500 (9th Cir. 1965); United States v. Central Bank of Denver, 843 F.2d 1300
16   (10th Cir. 1988).  Plaintiff's objective was to transform that property interest into real
17   dollars.  Pursuing a legal cause of action as a plaintiff is inherently different from the
18   type of activities that have been recognized by the courts as being "businesses" for
19   income tax purposes.  Plaintiff did not have a business that performed services for
20   clients or sold products to customers.  He had no clients or customers.  Nor were his
21   activities akin to the two recognized exceptions for "businesses" that do not perform
22   services for others or have customers, i.e., gambling and trading securities for one's
23   own account.  Even with gambling and securities trading the taxpayer is regularly and
24   continuously, often on a daily basis, opening and closing transactions that result in
25   immediate gains and losses to the gambler or securities trader.  Here pursuing a *qui*
26   *tam* action was a one-off event for the plaintiff, albeit one to which the plaintiff
27   contributed a great amount of effort over a long period of time.  However, there was
28   only one payday, and only one transaction.  Plaintiff's attempt to characterize the

matter as involving "10,000" claims is nothing more than semantics. It does not change the underlying nature of plaintiff's income, which was a single payment awarded to him from the settlement proceeds in a *qui tam* action, plus attorney's fees paid for him by Northrop. Plaintiff didn't hold himself out as a professional "relator," ready to bring *qui tam* actions against businesses that made false claims against the Government. Nor could he, because the relator's award is primarily based on whether the relator was the original source of the information that led to the Government's recovery under the FCA. <u>See</u> 31 U.S.C. § 3730(d)(1). Plaintiff's activities were similar to those of an executor managing an estate, <u>United States v. Pyne</u>, 313 U.S. 127, 61 S.Ct. 893 (1941), or of a person managing his own assets and affairs, <u>Higgins</u>, 312 U.S. at 217. The Supreme Court has found that such activities, even though regular and continuous, do not constitute carrying on a trade or business within the meaning of the Internal Revenue laws. Such activities are inherently different from what is commonly recognized as "carrying on a trade or business."

Common sense also tells us that plaintiff's activities did not constitute carrying on a trade or business. Were it so, anybody with a cause of action that could produce an award of taxable income would arguably be in a trade or business. While plaintiff put in almost 6,000 hours of work to obtain a $27,000,000 award, that is not different in kind from a plaintiff who obtains a $500,000 award and contributes 100 hours of his time to assisting his lawyers. After all, it is the client who is intimately familiar with the facts of his own case. Adopting plaintiff's theory would convert every lawsuit that produces taxable income into a business enterprise, a result that Congress has prevented by enacting § 212(1). In fact, under plaintiff's theory, pursuing the instant tax refund case would be treated as a trade or business.

Plaintiff's "trade or business" claim is hyperbole. The claim is nothing more than the reaction of a sophisticated litigant to the unfortunate operation of the tax laws on his income. The facts show that plaintiff's "income-producing activity . . . [was] a pursuit of investing or other profitmaking that lacks the regularity and

31

1  continuity of a business." <u>Guill</u>, 112 T.C. at 328. Plaintiff's novel theory would

2  abrogate the distinction between §§ 162 and 212. <u>See</u> <u>Green</u>, 2005 WL 2847869, at

3  *13 (noting that the distinction between § 162 and § 212 is "well-established" and a

4  taxpayer may not ignore that distinction). There is simply no support for plaintiff's

5  unique theory in § 162 or any cases interpreting this section. In sum, simply being a

6  party to a lawsuit does not rise to the level of carrying on a trade or business under the

7  internal revenue laws. Accordingly, plaintiff is not entitled to deduct the contingency

8  fee, the FCA Statutory Fee, or his costs as a trade or business expenses under § 162.

9  Rather, he may deduct these fees and costs as expenses paid for the production or

10  collection of income under § 212(1). Thus, based on the above the Court should

11  award summary judgment to defendant in this case.

12      B.    Plaintiff's Argument in Opposition to Issue No. 2:

13      In Defendant's Issue No. 2, Defendant erroneously asserts that Bagley's

14  expenses for attorneys' fees and costs are not deductible under I.R.C. §162 as

15  ordinary and necessary trade or business expenses, rather that such expenses are

16  deductible under I.R.C. §212 as expenses incurred in the collection or production of

17  income. Whether Bagley was in the trade or business of being a private attorney

18  general is not appropriate for a summary judgment because a determination of

19  whether an individual is engaged in carrying on a trade or business "requires an

20  examination of the facts." <u>Commissioner v. Groetzinger</u>, 480 U.S. 23, 36 (1987)

21  (citing <u>Higgins v. United States</u>, 312 U.S. 212, 217 (1941)). Determining whether a

22  particular activity constitutes a trade or business requires an inquiry into whether the

23  activity was undertaken or continued "in good faith, with the dominant hope and

24  intent of realizing a profit." <u>Independent Elec. Supply, Inc. v. Comm'r</u>. 781 F.2d 724,

25  726 (9th Cir. 1986). The assessment of profit motive is made after considering all the

26  facts and circumstances of the case. <u>Id.</u> at 727. Moreover, whether Bagley's

27  attorneys' fees and costs are deductible under I.R.C. §212 as asserted by Defendant is

28

32

1  also a question of fact.  See, e.g., Grant v. Comm'r,  84 T.C. 809, 825 (1985), aff'd,

2  800 F.2d 260 (4th Cir. 1986).

3      There are genuine issues of material facts in dispute as reflected in the parties'

4  Joint Statement of Undisputed and Disputed Facts, to include facts relating to:

5  Bagley's shift in career objective to pursue a business venture prosecuting claims

6  under the FCA; the efforts Bagley made in furtherance of this business venture (e.g.,

7  retaining certain professionals to assist in his FCA lawsuits); Bagley's personal

8  efforts and time commitments in prosecuting the FCA lawsuits; the financial risks

9  Bagley undertook in prosecuting the FCA lawsuits; and the services Bagley provided

10  in prosecuting the FCA and the Government's recognition of those services in

11  determining Bagley's *qui tam* award.

12      Although the issue of whether Bagley was engaged in a trade or business of

13  being a Private Attorney General is not appropriate for summary judgment as there

14  are genuine issues of material facts in dispute, the undisputed facts identified in the

15  parties' Joint Statement of Undisputed and Disputed Facts, are sufficient for the Court

16  to find that Bagley was engaged in a trade or business.

17      **1.**    **Bagley Is Entitled to a Deduction for his Legal Expenses Under**

18  **I.R.C. §162 as He Was Engaged in the Trade or Business of Being a Private**

19  **Attorney General.**

20      Section 162(a) provides a deduction for all "ordinary and necessary expenses

21  paid or incurred during the taxable year in carrying on any trade or business."  IRC §

22  162(a).  Defining what activities constitute a  "trade or business" (thus providing for

23  the proper reporting on a Schedule C) has sparked extensive litigation.  There is no

24  statutory or regulatory definition of a "trade or business."  As noted above, whether

25  an individual is engaged in a trade or business is a facts and circumstances test.  See,

26  e.g., Comm'r. v. Groetzinger, 480 U.S. 23, 27 (1987) (finding a taxpayer to be in the

27  trade or business of gambling).

28

1    Defendant dismisses Bagley's services in the *qui tam* lawsuits as not rising to
2    level of a trade or business by erroneously asserting:

3    a)    Bagley did not perform service for others and had no customers;

4    b)    Bagley's private counsel "did the lion's share of the work in bringing the
5          case to settlement in favor of the Government";

6    c)    Bagley was "no more than a party to a complex lawsuit"; and

7    d)    Bagley's *qui tam* lawsuits were in essence a one-time event.

8    Defendant assertions are meritless.  Bagley did provide services, substantial services,
9    to the Government in the *qui tam* lawsuits.  Whether Bagley retained the services of
10   professionals to assist him in his trade or business is not dispositive that Bagley was
11   not in a trade or business.  The real parties in interest in the *qui tam* lawsuits were the
12   United States and TRW.  Bagley's filed two *qui tam* lawsuits that collectively
13   involved more than 10,000 false claims and 10 fraudulent schemes.  The two *qui tam*
14   lawsuits were consolidated when the Government ultimately intervened in the second
15   FCA lawsuit.

16        a.    **False Claims Act and the Trade or Business of Providing**
17   **Services as a Private Attorney General**

18        False Claims Act ("FCA") actions against the false claimant may be brought by
19   the government or by a private person on behalf of the government (the "relator").
20   See 31 U.S.C. § 3730.  Actions brought by a relator are known as "*qui tam*" lawsuits.
21   "A *qui tam* relator [thus] is essentially a self-appointed private attorney general, and
22   his recovery is analogous to a lawyer's contingent fee."  United States ex rel. Milam v.
23   University of Texas M.D. Anderson Cancer Ctr., 961 F.2d 46, 49 (4th Cir. 1992).
24   "[T]he entire purpose of the FCA's *qui tam* provisions is to employ the help of
25   individuals to uncover fraud against the government."  United States ex rel. Kelly v.
26   Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993).  "[I]n the FCA context, Congress has
27   created a scheme in which the interests of the private prosecutor (that is, the relator)
28   coincide with the public interest in remedying harm to the federal treasury."  United

34

1  States ex rel. Kelly v. Boeing Co., 9 F.3d 743, 748 (9th Cir. 1993).  As an incentive to
2  bring *qui tam* claims, the FCA awards relators in successful lawsuits.  There are three
3  levels of awards to relators: (1) 0-10% if the disclosed information was publicly
4  available; (2) 15% to 25% if the *qui tam* lawsuit is based on non-public information
5  and the government intervenes; and (3) 25% to 30% if the government does not
6  intervene. 31 U.S.C. §3730(d).  The range between 15 and 25% distinguishes between
7  a relator that simply provided information and a relator that provided significant
8  services to the litigation effort.  See Alderson v. US, 718 F. Supp. 2d at 1190.

9       Bagley filed two *qui tam* lawsuits against TRW Inc. ("TRW") that resulted in a
10  substantial settlement to the Government.  Bagley received 24.5% of the settlement
11  award, a clear statement by the Government that Bagley had dedicated extensive
12  services to the joint litigation effort.

13       The 24.5% FCA payment to Bagley amounted to $27,244,000.  Of that amount,
14  $8,990,520 was paid to his Private Counsel pursuant to a contingency fee
15  arrangement between them.  In addition, the FCA also provides for statutory attorneys
16  fees.  Accordingly, pursuant to the FCA, Northrup Grumman Corp. (the successor to
17  TRW) ("Northrup") paid statutory fees of $9,407,295 directly to Bagley's Private
18  Counsel (the "Statutory Fee").

19       The $27,244,000 is properly reportable as income from a trade or business,
20  based on the extensive services Bagley provided in his role as a Private Attorney
21  General or Private Prosecutor.  From that amount, he is entitled to a deduction for the
22  ordinary and necessary legal expenses that were paid to his counsel of $8,990,520,
23  and would properly pay tax on $18,253,480 of ordinary income.  With regard to the
24  Statutory Fee paid to his Private Counsel, Bagley has alternate positions.  It should
25  either be included in Bagley's income, with an offsetting deduction for ordinary and
26  necessary legal fees or the Statutory Fee should be excluded from Bagley's tax return
27  entirely (and should only be reportable by the attorneys who actually received it).
28

1   Either way, the tax result is the same, and Bagley would properly pay tax on

2   $18,253,480 he received.

3

                          **b.    An Analysis Pursuant to the Treasury Regulations**

4   **Support Bagley's Asserted Trade or Business**

5         Courts frequently consider the factors provided in Treasury Regulation

6   §1.183-2(b) to determine whether a taxpayer had the requisite profit motive to be

7   considered engaged in a trade or business: (1) manner in which the taxpayer carries

8   on the activity; (2) expertise of the taxpayer or his advisors; (3) time and effort

9   expended in carrying on the activity; (4) expectation that assets used in the activity

10  may appreciate in value; (5) success of the taxpayer in carrying on other similar or

11  dissimilar activities; (6) taxpayer's history of income or losses from the activity; (7)

12  amount of occasional profits, if any, from the activity; (8) financial status of the

13  taxpayer; and (9) elements of personal pleasure or recreation.  <u>See, e.g.</u>, <u>Independent</u>

14  <u>Electric Supply, Inc. v. Comm'r</u>, 781 F.2d 724 (9th Cir. 1986);  <u>Harrison v. Comm'r</u>,

15  T.C. Memo 1996-509.  "The number of factors for or against the taxpayer is not

16  necessarily determinative, but rather all facts and circumstances must be taken into

17  account, and more weight may be given to some factors than to others." <u>Harrison</u>,

18  <u>supra</u> (finding a taxpayer to be in the trade or business of treasure hunting even

19  though he was gainfully employed in another occupation and never made a profit

20  from treasure hunting).

21        Applying the factors in Treasury Regulation §1.183-2(b) to the facts of this

22  case supports Bagley's profit objective in prosecuting the two FCA lawsuits against

23  TRW: (1) Bagley prosecuted the FCA lawsuits in a business-like manner including

24  keeping detailed and contemporaneous time logs, as well as dedicating himself

25  completely to the litigation efforts when needed; (2) Bagley's expertise was necessary

26  to the successful litigation and included knowledge of complex accounting concepts

27  and the ability to structure the evidence to show TRW's failure to comply with

28  government cost accounting regulations; (3) Bagley dedicated substantial

1   time—approximately 6,000 hours over 8 ½ years to the FCA lawsuits—and was not

2   otherwise employed; (4) there were no assets to appreciate, but Bagley had the

3   expectation that his services would greatly increase the FCA recovery; (5) Bagley had

4   successfully risen through the accounting ranks at TRW and gained expertise with

5   government cost accounting regulations—the same skill set he utilized in the

6   prosecution of TRW; (6) Bagley had a successful career and livelihood at TRW from

7   the same skills he brought to bear on the *qui tam* lawsuits; (7) Bagley focused on the

8   profit that would be realized upon the successful resolution of the FCA lawsuits; (8)

9   Bagley only gainful "employment" was the prosecution of the FCA lawsuits; and (9)

10  prosecuting the FCA lawsuits was not personally pleasurable or recreational to

11  Bagley—on the continuum ranging from an "activity to make a profit" to a "hobby,"

12  prosecuting the FCA lawsuits was clearly on the "activity to make a profit" side.

### i.    Defendant's Assertion  that Bagley Provided No Services to Others is Erroneous

13

14          In Commissioner v. Groetzinger, supra, the Supreme Court held that a taxpayer

15  who gambles only for himself was engaged in a trade or business.  Prior to engaging

16  in such trade or business, the taxpayer spent 20 years in sales and market research for

17  manufacturing.  After being terminated in February, 1978, he devoted the remainder

18  of 1978 to gambling activities, primarily on greyhound races.  Groetzinger spent

19  substantial time studying racing forms, programs, and other gambling related

20  activities.  He never placed bets for any other person, sold tips, collected commissions

21  for placing bets, or functioned as a bookmaker.  Rather, Groetzinger gambled solely

22  for his own account and he had no other profession or employment.  Even though the

23  taxpayer in Groetzinger did not report his gambling activities on his originally filed

24  tax return as income and loss from a trade or business, the Court held that the

25  taxpayer was engaged in the trade or business of gambling.

26          Applying the Groetzinger analysis to Bagley's case demonstrates that Bagley's

27  facts are even stronger to support his trade or business of being a private attorney

28

37

general.  Unlike the taxpayer in Groetzinger, who abruptly changed his trade or business from being a sales and marketing employee in the manufacturing industry, to gambling primarily on greyhounds; here, Bagley continued to use the expertise he gained while he was in the trade or business of being an employee at TRW.[7] Furthermore, while the taxpayer's gambling activities in Groetzinger lasted for roughly 10 months, Bagley's services were for approximately 8 ½ years.  Neither the taxpayer in Groetzinger nor Bagley had any other type of profession or employment. Further, with regard to the requisite profit motive to be in a trade or business, Bagley's activities and services resulted in a recovery of over $27,000,000, whereas the taxpayer in Groetzinger suffered a several thousand dollar loss.

In Groetzinger, supra, the Supreme Court expressly rejected the requirement that a taxpayer's activity must offer goods and services to others to be a trade or business under IRC §162.  Groetzinger, supra, at 24.  In Groetzinger, the taxpayer never placed bets for any other person, or sold tips, or collected commissions for placing bets, or functioned as a bookmaker.  He gambled solely for his own account. He had no other profession or type of employment Id..  Nevertheless, the Supreme Court erased any doubt that a taxpayer had to offer goods or services to others to be a trade or business, and rejected the government's assertion to that effect.

Although providing goods or services to third parties is not required to be engaged in a trade or business, Bagley did in fact provide services, regular, continuous and substantial services in prosecuting the FCA lawsuits. [See Stip. of Facts P53-P97].  The services Bagley provided to TRW as an employee were based on his expertise in accounting and compliance with government cost accounting regulations, were the same services and expertise Bagley utilized to prosecuted the qui tam lawsuits.  [See Stip. of Facts P53-P58].  To that end, he provided services in the form of skilled analysis of the TRW accounting practices in light of the

---

[7] The performance of services as an employee constitutes a trade or business. Treas. Reg. § 1.162-17(a).

38

1    government cost accounting regulations.  [*See* Stip. of Facts P53-P58]. Bagley also

2    provided substantial services to the Government by performing financial damage

3    calculations and through numerous meetings with the Defense Contract Auditing

4    Agency ("DCAA"), ultimately resulting in the successful mediation and settlement of

5    the case.  [*See* Stip. of Facts P97-P106].  His priority was to put his best effort

6    forward in order to maximize the FCA payment he would receive. [*See* Ex. 130].

7
8                      ii.     **Defendant's Assertion that Bagley's Private Counsel**
     **"did the lion's share of the work in bringing the case to settlement in favor of the**
     **Government" is Erroneous**
9
              Defendant's assertion that Bagley's Private Counsel "did the lion's share of the

10   work in bringing the case to settlement in favor of the Government" is inconsistent

11   with undisputed facts in the Joint Statement of Undisputed and Disputed Facts.

12   Because the attorneys' hours are an aggregate of all of the attorneys' hours, the

13   comparison should be on an "apples to apples" basis, in other words, on an individual

14   basis.  The hours that Bagley spent prosecuting the *qui tam* lawsuits were more than

15   any one of his private attorney's hours.  [*See* Ex. 18 and Ex. 19]. Accordingly, Bagley

16   and his Private Counsel in the *qui tam* action *shared* the lion's share of the work.  In

17   particular, Bagley performed the following integral and critical services in

18   prosecuting the two *qui tam* lawsuits:

19                      •Bagley's personal effort was required to locate documentary evidence

20   because of his knowledge of the complex questionable accounting TRW practices

21   [*see* Joint Stipulation of Settled and Unsettled Facts ("Stip. of Facts"), P.27], Bagley

22   reviewed  and located significant evidence in reviewing 450,000 pages of documents

23   [*see* Stip. of Facts, P.74], Bagley spent several thousand hours reviewing

24   approximately 537,690 pages of documents to locate evidence [*see* Stip. of Facts,

25   P.69], Bagley reviewed 54 boxes of documents produced by TRW and analyzed their

26   applicability to the Launch Vehicle Project [*see* Stip. of Facts, P.75], and Bagley

27

28

                                              39

1  reviewed 214 boxes of documents produced by TRW and analyzed their applicability

2  to nine discrete components of the *qui tam* lawsuits;

3             •Bagley, not his private counsel, assumed the financial risk of paying

4  TRW's litigation costs for the second lawsuit if the prosecution subsequently turned

5  out to be frivolous, *see* 31 § 3730(d)(4);

6             •Bagley, not his private counsel, organized and analyzed the 87,690

7  pages of documents  obtained from TRW after the Government initially declined to

8  intervene in the second lawsuit [*see* Stip. of Facts, P.43-P.45];

9             •Bagley, himself, spent 5,962.8 hours, prosecuting the *qui tam* lawsuits

10  against TRW [*see* Stip. of Facts, P.60];

11             •Bagley analyzed documents [*see* Stip. of Facts, P.45];

12             •Bagley identified documents to request from TRW [*see* Stip of Facts,

13  P.68];

14             •Bagley identified omissions from TRW's response to requests for

15  production [*see* Stip. of Facts, P.92];

16             •Bagley reviewed deposition testimony of TRW witnesses [*see* Stip. of

17  Facts, P.82];

18             •Bagley maintained contemporaneous daily logs of his services [*see* Stip.

19  of Facts, P.84];

20             •Bagley assisted in preparing for depositions [*see* Stip. of Facts, P.88];

21             •Bagley explained the false billing practices to the government [*see* Stip.

22  of Facts, P.65];

23             •Michael Pace, the U.S. Air Force investigator asked Bagley to review

24  450,000 pages of  documents produced by TRW to support the FCA prosecution

25  lawsuits [*see* Stip. of Facts, P.71];

26             •Bagley read case law and applied it to the *qui tam* lawsuits [*see* Stip. of

27  Facts, P.94];

28             •Bagley helped develop litigation strategy [*see* Stip. of Facts, P.95];

1    •Bagley strengthened potential weaknesses in the FCA lawsuits by

2  analyzing and explaining evidence [*see* Stip. of Facts, P.96];

3    •Bagley explained and critiqued TRW accounting practices based on

4  FCA caselaw [*see* Stip. of Facts, P.97];

5    •Bagley helped calculate and substantiate financial damages [*see* Stip. of

6  Facts, P.99];

7    •Bagley met and reviewed the Defense Contract Audit Agency's

8  ("DCAA") damage calculations and gave in-depth explanations to resolve

9  discrepancies between his calculations and DCAA calculations [*see* Stip. of Facts,

10  P.100-P.103];

11    •Bagley was able to support higher financial damage figures than

12  government [*see* Stip. of Facts, P.104];

13    •After the government initially declined to intervene in the second

14  lawsuit [*see* Stip. of Facts, P.37], he personally placed himself at risk  continuing to

15  prosecute the second lawsuit, *see* 31 § 3730(d)(4),  and eventually convinced the

16  government after 2.5 years to reconsider and intervene in the second lawsuit [*see* Stip.

17  of Facts, P.46-P.49]; 60% of recovery was from the second lawsuit [*see* Stip. of Facts,

18  P.112]; and

19    •Bagley helped develop litigation strategies  and prosecution theories

20  because of his professional expertise and his interactions with decision makers at

21  TRW. [*see* Stip. of Facts, P.54 & P.63].

22    **iii.    Bagley Was Much More Than A Party to a Complex**

23    **Lawsuit**

24    Bagley was a private attorney general as explicitly defined in the FCA and by

25  the Ninth Circuit.  See 31 U.S.C. §3730(d);   United States ex rel. Kelly v. Boeing

26  Co., 9 F.3d 743, 748 (9th Cir. 1993).  In addition to his role as a private attorney

27  general, Bagley also provided significant services to the FCA lawsuit as a member of

28  the litigation team. In the capacity as a service provider, or " private attorney general"

41

1    as designated under the FCA, Bagley engaged in a trade or business.   In addition to

2    the extended duration of services as described above, the nature and character of

3    Bagley's services showed that he was engaged in the trade or business of providing

4    services, litigation support, and expert-type services (e.g., financial damage

5    calculations) in the *qui tam* lawsuits.

6        Further, Bagley's services were of a nature and character that would normally

7    be performed by attorneys, paralegals, and experts.  To say the least, the services he

8    provided to the litigation effort were above and beyond the role of a party or client in

9    a normal case, as discussed above.

10            **iv.    Defendant has Erroneously Characterized Bagley's**

11    **Services to the *Qui Tam* Lawsuits as a One-time Event**

12        As discussed herein, Bagley's activities were regular, continuous, and  profit-

13    motivated, for more than eight (8) years.  Far from being a one-time event, Bagley

14    two *qui tam* lawsuits involved more than 10,000 false claims and 10 fraudulent

15    schemes.  However, even if Bagley's *qui tam* lawsuits were considered a single event,

16    the courts have held that taxpayers engaged in a single project are still engaged in a

17    trade or business.  See e.g., Snyder v. United States, 674 F.2d 1359 (10th Cir. 1982)

18    (finding a practicing attorney to also be in the trade or business of producing a

19    photography book because he had a profit motive).

20        Although it took approximately 8 years for Bagley to realize a profit, a trade or

21    business can exist even if there are no profits in the initial years, and there is no

22    requirement that the taxpayer must expect that profits will be generated immediately

23    or within a short time. Ellsworth v. Comm'r, 21 T.C.M. 145, 150-51 (1962) (finding

24    a trade or business existed even though the taxpayer was 65 years old and it would

25    take 15 years to develop a breeding herd of cattle and generate a profit, because the

26    taxpayer's purpose in carrying on the activity was to make a profit).

27

28

### 3. Conclusion

Bagley's position is he was engaged in the trade or business of being a Private Attorney General or Private Prosecutor, and received payment for his services in his trade or business. Thus, Bagley is entitled to deduction the litigation fees on his Schedule C, *Profit or Loss From Business*, as ordinary and necessary trade or business expenses under I.R.C. §162.

Respectfully Submitted,

DATED: February 28, 2011

ANDRE BIROTTE JR.
United States Attorney
SANDRA R. BROWN
Assistant United States Attorney
Chief, Tax Division

DARWIN THOMAS
Assistant United States Attorney
Attorneys for Defendant,
United States of America

DATED: February 28, 2011

HOCHMAN SALKIN RETTIG
TOSCHER & PEREZ
KURT KAWAFUCHI
BARBARA LUBIN

By:
for
SHARYN FISK
Attorneys for Plaintiff,
Richard D. Bagley

43

1  DEFENDANT'S EVIDENTIARY OBJECTIONS

2      Defendant believes that most of plaintiff's proposed facts, while undisputed,

3  are irrelevant, but will not interpose such an objection because the Court can

4  determine their relevance.  Also, many of plaintiff's proposed facts are conclusions

5  drawn from other facts, and many contain descriptive words that are themselves

6  conclusory.  However, where the "underlying" facts are undisputed, defendant will

7  not object solely on the basis that the proposed facts are conclusory.

8      Defendant submits the following evidentiary objections to plaintiff's Exhibits.

9  1.    Exhibit 1, factual statement pages 4-5.  Statement that the Government's

10  determination to pay a 24.5% FCA Payment was due to the unusual length and

11  complexity of the case and the close cooperation between Plaintiff's private lawyers

12  and the Government's lawyers (proposed fact P117) is hearsay.

13  2.    Exhibit 2.  Newspaper articles are hearsay.

14  3.    Exhibit 57.  Not authenticated.

15  4.    Exhibit 78.  Not authenticated.

16  5.    Exhibit 130.  Defendant objects to the following statements for lack of

17  foundation, and as probable hearsay.  ¶ 13- The statement that a law firm was hired

18  "because of the firm's FCA expertise [and] the good working relationship the firm

19  had with the DOJ."  ¶ 17- The statement that "[m]y attorneys perfected the

20  presentations, which were then presented to DOJ attorneys."  ¶ 35- The statement that

21  "my analysis was used to convince the DOJ that we had the correct assessment of

22  financial damages and to vigorously defend our position in mediation with TRW."

23  6.    Exhibit 130, ¶¶ 20 and 21.  Lack of foundation as to the assumption of

24  substantial financial risk by plaintiff.

25  //

26  //

27  //

28  //

44

7.    Exhibit 130, ¶ 38- Second sentence beginning with "The United States Attorney's Office stated that ... " Hearsay.

ANDRE BIROTTÉ JR.
United States Attorney
SANDRA R. BROWN
Assistant United States Attorney
Chief, Tax Division

2/28/11

DARWIN THOMAS
Assistant United States Attorney
Attorneys for Defendant
United States of America

45