1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

RICHARD D. BAGLEY,       )  Case No. CV 10-00483-RT(FMOx)

      Plaintiff,        )  FINDINGS OF FACT AND
                      )  CONCLUSIONS OF LAW

   v.               )

UNITED STATES OF AMERICA,  )

      Defendant.      )

---

Through this action, Plaintiff Richard D. Bagley ("Bagley") seeks a refund of federal income taxes paid by him in the amount of $3,874,407 with respect to the 2003 tax year. From 1994 through 2003, Bagley, on behalf of the United States of America ("government"), prosecuted TRW Inc. ("TRW") for false claims under the False Claims Act ("FCA"), 31 U.S.C. § 3729 et seq. For his actions as a relator under the FCA, the government paid Bagley a FCA award of $27,244,0000 and statutory attorneys' fees of $9,407,295. Of the $36,651,295 of income, Bagley paid a total of $18,477,815 to his attorneys. On his 2003 amended federal tax refund claim, Bagley reported the $36,651,295 gross income as properly attributable to his "trade or business" of being a private attorney general, and reported the $18,477,815 paid to his private attorneys as ordinary and necessary business expenses deductible pursuant to Section 162 of the Internal Revenue Code. The

1   Internal Revenue Service ("IRS") denied Bagley's refund claim, stating that the

2   $36,651,295 is "Other Income" as defined in Section 212 of the Internal Revenue

3   Code, and the $18,477,815 paid to Bagley's private attorneys is an itemized

4   deduction reportable on Schedule A.

5        The court conducted a bench trial on this matter, and now issues its findings

6   of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

7   After carefully reviewing all the evidence and hearing argument presented by the

8   parties' counsel, the court makes the following Findings of Fact and Conclusions of

9   Law:

10                          FINDINGS OF FACT[1]

11        This is an income tax refund suit filed by Richard D. Bagley ("Bagley"). The

12   Complaint for Refund of Internal Revenue Taxes was filed in Case No. CV-10-

13   00483-RT by Bagley on January 22, 2010. The Defendant is United States of

14   America ("United States" or "Government").

15        Richard D. Bagley, the Plaintiff, has an MBA and an MS in accounting from

16   UCLA. Bagley is not an attorney and has never been to law school. From 1967

17   until 1993, Bagley worked for TRW in a variety of positions. During his

18   employment with TRW, Bagley had prior experience with the FCA in 1985when he

19   helped investigate accounting fraud in another office of TRW. Upon Bagley's

20   identification of the source of the accounting fraud, TRW made voluntary

21   disclosures to the Government with respect to these claims.

22        From 1987 through 1992, Bagley was the Chief Financial Manager for

23   TRW's space and technology group. As Chief Financial Manager for that group,

24   Bagley was responsible for, among other things, contract proposal pricing, indirect

25   expense budgeting and control, and accounting. When Bagley was Chief Financial

26

27  _____

28   [1]The Findings of Fact are based on the trial transcripts, the court's notes of trial
     testimony of witnesses, and the exhibits admitted into evidence.

Manager of the space and technology group at TRW, one of his primary functions was to ensure the integrity of the accounting records and that the bills were sent to the government.

Bagley understood the accounting schemes at TRW and how the costs flowed through the accounting system into the invoices and payment requests which TRW submitted to the government for payment. Starting about 1989 and continuing through 1991, during his employment with TRW, Bagley became aware of false claims made by TRW to the government.

On or about March 29, 1991, Bagley signed a certification to the Federal government that TRW's "indirect" expense claim for the TRW Space and Technology Group for 1990 represented reimbursable costs. The certification was under penalty of perjury and, at the time he signed it, Bagley believed that it was incorrect. Bagley signed another certification to the Federal government verifying TRW's "indirect" expense claim for TRW's 1991 year. He also signed the 1991 certification under penalty of perjury even though he did not believe it was correct at that time.

In TRW's 1990 and 1991 indirect expense certifications, Bagley certified, to the best of his knowledge and belief, that he had reviewed each year's Indirect Cost Proposal, that all costs in the proposal were allowable in accordance with the requirement contracts, that the proposal included no costs that were unallowable, and that all costs were properly allocable to in accordance with applicable regulations. Bagley signed the certifications to the government even though he knew they were wrong in order to retain his job. At that time, Bagley had not initiated FCA proceedings against the government. When Bagley discovered the information regarding TRW's false claims, he discussed it with two individuals whom he believed were operating the false claim schemes, the general manager of his group and his functional supervisor, but his concerns were not resolved.

Bagley was notified in early 1993 that he was going to be laid off as a result

of a reorganization at TRW.  Bagley was ultimately laid off in August of 1993.
When he left TRW, Bagley took documents that pertained to the false claims issue.
After he was laid off, Bagley looked for employment for about a year.  Bagley has
had no other employment since being laid off by TRW.  Until 2003, Bagley's
sources of income after being laid off were a retirement pension from TRW and
some savings.

In mid-1994, Bagley sued TRW for wrongful employment termination.
Bagley ultimately lost the wrongful termination lawsuit against TRW.

In June 1994, Bagley met with Tuttle & Taylor to discuss filing a FCA
lawsuit.  He met Michael Bierman ("Bierman") for the first time.  Bierman was an
experienced attorney who had prior FCA litigation experience.  Bagley retained
Tuttle and Taylor to represent Bagley for the FCA suits on October 1, 1994.
Because of Bagley's role in falsely certifying TRW's "indirect" expense summaries
which were submitted to the government, Bagley retained Tuttle & Taylor in part to
help him seek immunity for the possibility that he could be charged criminally in
submitting false documents to the United States.

Prior to filing any FCA suits, Bagley spent over 200 hours in furtherance of
the FCA prosecution activity, including his attendance at numerous meeting and
submitted written representations to Bierman.  Bagley filed two lawsuits on behalf
of the United States under the FCA against TRW for false claims.  Bagley's FCA
suits involved claims by TRW for the recovery of "indirect" costs charged under
government contracts.  The essence of Bagley's FCA lawsuits was that TRW
allocated certain costs to the government as indirect expenses when those costs
were not properly pooled as indirect costs and not allowable as charges to the
government.

Bagley filed the first FCA lawsuit on behalf of himself as relator and on
behalf of the United States on November 16, 1994.  This complaint asserted eight
claims against TRW.  On June 21, 1995, approximately seven months after the first

1 │ FCA complaint was filed, Bagley as a relator filed a second FCA complaint against

2 │ TRW.   The second FCA suit, which Bagley continued to pursue after the

3 │ Government declined to intervene, had amounts of damages that were double the

4 │ damage amounts in the first FCA suit.  Bagley exerted diligent efforts to convince

5 │ the Government to intervene in the FCA suits in order to reach a successful

6 │ conclusion.

7 │      By 1996, Bagley hired a second law firm that specialized in FCA suits,

8 │ Phillips and Cohen.  Bierman subsequently became a partner in the law firm Luce,

9 │ Forward, Hamilton & Scripps ("Luce Forward") and Luce Forward continued

10 │ representing Bagley in the FCA suits until 2003.

11 │      In 1998, the Federal government intervened on two of the eight claims

12 │ alleged in the first FCA suit, and Bagley dismissed the remaining claims in that suit.

13 │ Bagley continued to pursue the second FCA suit after the Government initially

14 │ declined to intervene, based upon his belief that he would be able to find favorable

15 │ evidence which he knew existed and the identity of those engineers who had

16 │ knowledge of such evidence.  Bagley spent considerable time in "structuring the

17 │ evidence" in the second lawsuit in order to convince the Government to intervene.

18 │ The federal government intervened on the second FCA suit in 2000.

19 │      From June 1994 through the settlement of the FCA claims in 2003, Bagley

20 │ provided information to his attorneys which he thought was important to the FCA

21 │ suits and which they needed to know in order to effectively prosecute them.  During

22 │ the 1994 to 2003 time period, Bagley exclusively worked on his FCA prosecution

23 │ activity, and was not otherwise employed.

24 │      Bagley maintained a contemporaneous log of hours he worked in relation to

25 │ the litigation of the *qui tam* actions.  The log started in June of 1994, when Bagley

26 │ was assisting his attorneys in preparing the first FCA complaint.  Bagley spent

27 │ approximately 5,963 hours on his FCA activity.  The hours spent by Bagley in the

28 │ FCA prosecution activity varied from year to year based on the present demands of

1  the litigation.  Bagley's counsel spent 21,054 hours prosecuting the FCA suits.

2      Bagley attended meetings with his counsel and the Federal government's

3  counsel.  He attended monthly litigation meetings conducted by AUSA David Long,

4  and he also attended 40-50 meetings with the Defense Contract Audit Agency

5  ("DCAA") to reach a consensus on the financial damages to the Government.

6  Bagley was deposed during the FCA litigation.  Bagley provided to his private

7  counsel his written summaries of information regarding TRW's false claims.

8      Bagley's attorneys would prepare documents and Bagley made comments on

9  draft documents prepared by his attorneys, and Bagley spent a lot of time looking

10  through TRW documents.  Bagley was able to help identify key documents of TRW

11  because he "worked at TRW and the documents of interest were documents that [he]

12  knew existed from having looked at them and [he] knew where they were and [he]

13  knew whose possession they were in."  Because he "had worked at TRW in

14  association with those individuals," Bagley knew and identified individuals at TRW

15  who had knowledge of a certain false claim.

16      Bagley stayed involved with the prosecution of the FCA claims by his private

17  counsel team because "they weren't accountants and hadn't spent 25 years working

18  with TRW and didn't have an in-depth understanding of TRW's accounting system

19  or the people or the products or anything about the company which was necessary to

20  understand how the frauds occurred and where the evidence was."

21      Bagley was helpful to his attorneys in the following ways.

22  a.    First, Bagley had a fairly extensive knowledge of most of the facts that

23        underlay the FCA claims because "he was either there or he knew what

24        happened if he wasn't there."  He spent a significant amount of time

25        presenting the evidence and issues to his attorneys in order to help

26        them understand various elements of the FCA suits and thereby

27        improve the probability of success.

28  b.    Second, he had an encyclopedic knowledge of the federal acquisition

6

regulations ("FAR") and of the accounting rules that related to the cost pools. Bierman found this to be very helpful, as he was not an expert in that area and Bagley was able to assist him particularly by providing the broader context of the regulations and rules, i.e. if the attorneys were interpreting one particular rule and Bagley was able to point out if there was another rule that would also play into the analysis.

c. Third, he had a good knowledge of the pricing provisions of the government contracts. Bierman found this helpful because that information was not all compiled in one place, so Bagley's understanding of the pricing procedures and claims settlement procedures was very helpful.

d. Fourth, Bagley understood what could be characterized, according to Bierman, as the "code" used by TRW employees when they wrote various memoranda. He also knew where to look specifically for documents that would memorialize decisions made by TRW, and how to determine whether a memorandum which might, on its face, look innocuous was, in fact, TRW's recording of an improper cost accounting decision.

Further, Bagley, along with Private Counsel, substantiated the false claims allegations by obtaining documentary evidence that did so, and then interviewing or deposing the involved engineers to confirm the types of activities they were engaging in. Bierman found Bagley's familiarity with the witnesses to be very helpful when deposing them.

There were times when Bagley felt that Private Counsel did not understand the issues. In response, Bagley provided the specific information they needed to understand what the government regulations required. He also interpreted those regulations for them and supported his comments through case law.

Bagley drafted and/or edited at least 73 documents in furtherance of the FCA

1  litigation activity. Bagley also played a primary role with respect to calculating
2  damages and, to that end, attended 40 to 50 meetings with the DCAA between 1997
3  and 2003. He also spent substantial hours doing his own damage calculations.

4       Bagley was involved in all aspects of gathering documentary evidence against
5  TRW. He reviewed the extensive production of documents received from TRW,
6  and he structured the evidence found in those documents to put together the false
7  claim allegations against TRW.

8       Michael Pace, a United States Air Force Investigator, requested that Bagley
9  review TRW's document production. Between 1995 and early 1997, Bagley
10 reviewed the contents of approximately 212 to 218 boxes of documents produced
11 by TRW between mid-1995 and early 1997. In 1998, Bagley reviewed an additional
12 36 boxes produced by TRW with respect to the second FCA suit. The government
13 helped Bagley in his document review by making copies of certain documents
14 Bagley thought were of exceptional importance.

15      Bagley had to be involved throughout the entire FCA litigation. Bagley
16 testified: "Because these false claims were allegations of accounting fraud and I
17 was the only person on the prosecution team that understood all aspects of the
18 accounting fraud. And I possessed information that was necessary to the
19 prosecution that nobody else on the team had." There were times during the
20 prosecution of the FCA suits when Bierman would request Bagley to perform
21 certain services to assist in the litigation and Bagley was always responsive. Bagley
22 was the primary source for the facts and for much of the accounting, and his actions
23 made the two cases much stronger for the government. For example, there were
24 times when Bagley's explanations regarding the facts were integrated into
25 documents Bierman provided to the court and/or the Government.

26      Bagley performed these services "in order to successfully prosecute the
27 claims so that [he] would receive an award." The FCA prosecution activity was a
28 very physically and emotionally grueling experience for Bagley. Bagley did not

1   consider the FCA prosecution activity to be a hobby.   The FCA litigation had a
2   negative impact on his life in that his former TRW colleagues had been directed by
3   TRW to avoid interacting with him.  Bagley considered himself to be in a trade or
4   business, with his occupation being a "Private Attorney General."  On his originally
5   filed 2003 IRS Form 1040, Bagley identified his occupation as "Private Attorney
6   General" and he issued IRS Forms 1099-MISC to his attorneys for legal fees he
7   paid to them and filed these IRS Forms 1099-MISC with the Internal Revenue
8   Service ("IRS").

9      Bagley never filed any business tax returns for his FCA relator activity other
10  than his second amended 2003 federal return.  Bagley never filed any business
11  registration or notice anywhere with a city or the state.  Bagley did not do any
12  advertising of his business.  Bagley did not keep accounting books and records for
13  his qui tam relator activity.

14      Bagley did not keep track of expenses that he personally incurred in the FCA
15  lawsuits.  Bagley's expenses in the qui tam law suit were parking fees, gasoline, and
16  cost of paper.  Bagley's attorneys in the FCA suits advanced a total of $527,766 in
17  costs.   Bagley did not have to pay his FCA lawsuit filing fee.

18      Bagley's attorneys explained to him that he could be liable to TRW for filing
19  a frivolous lawsuit if he could not substantiate the allegations, and that, in the FCA
20  lawsuit, he  could be responsible to TRW for its attorneys' fees and their expenses
21  and costs.  However, Bagley and his attorneys agreed in their best judgment that the
22  qui tam lawsuit was meritorious.

23      In July of 2002, Bagley and his *qui tam* attorneys (Luce Forward) entered into
24  an amended retainer agreement in anticipation of settlement or resolution of the *qui*
25  *tam* actions.  Under this agreement, Bagley was not liable or required to pay any
26  costs or attorneys' fees or other expenses incurred by the law firms in prosecuting
27  the qui tam action unless and until Bagley received a reward.

28      Some of the provisions in the amended fee agreement had to do with

indemnification against liability for federal taxes which may arise if the Statutory Fee award was determined to be Bagley's income. At the time the amended fee agreement was entered into, Bagley had researched the taxation of his award and the attorney's fees that were associated with it and understood there was case law to support that the Statutory Fee award was taxable income. Bagley realized that, if the Statutory Fee award was paid and treated as income to him, his taxes would go up by several million dollars. The amended retainer agreement contained an indemnity agreement from his *qui tam* counsel to pay the additional tax due to the inclusion of the Statutory Fee award as income if certain conditions were met.

The amended retainer agreement does not refer at all to the possibility that the statutory fee award may also be deducted as a trade or business. Bagley's asserted "trade or business" never came up in the negotiation of the amended retainer agreement. Bagley never sent a letter to Luce Forward or his other FCA counsel telling them of his belief that his FCA activities were a trade or business. Bagley claims he researched the issue, but did not find any case law in which an FCA award was treated as trade or business income.

To comply with the indemnity agreement, Bagley was required to file his original 2003 income tax return that his *qui tam* attorneys (Luce Forward) directed him to file, and his original return was filed per their direction.

In June 2003, Northrop Grumman Corp. ("Northrop"), the successor to TRW, agreed to pay the United States $111.2 million to settle the FCA allegations in the two FCA suits filed by Bagley. In 2003, the United States Department of Justice awarded Bagley a FCA *qui tam* award in the amount of $27,244,000. The United States Department of Justice issued Bagley a 2003 Form 1099-MISC reporting the $27,244,000 FCA *qui tam* award in Box 3, *Other Income*. In 2003, Bagley paid his Private Counsel (Phillips & Cohen LLP and Luce, Forward, Hamilton, and Scripps LLP) $8,990,520 as a contingency fee. Prior to this payment, the only attorneys' fees paid by Bagley was the amount of $3,500 to Tuttle & Taylor, to represent him

10

1   in seeking immunity from prosecution from the Department of Justice for his own
2   role in TRW's false claims when he was a TRW employee.

3       In September 2003, Northrop wire transferred $9,407,295 to Phillips &
4   Cohen, LLP as payment of the statutory attorneys' fee award expenses required by
5   31 U.S.C. § 3730(d) (the "Statutory Fee"). Northrop issued Bagley a 2003 Form
6   1099-MISC reporting the $9,407,295 Statutory Fee in Box 14, *Gross proceeds paid*
7   *to an attorney*.

8       Bagley submitted to Luce Forward for its review three possible 2003 federal
9   income tax returns for the original return to Luce Forward for its review, none of
10  which included a Schedule C form for treatment of the *qui tam* income. Luce
11  Forward directed Bagley to file an original 2003 return, 2003 Form 1040, *U.S.*
12  *Individual Income Tax Return*, which reported his qui tam award as "other income"
13  and omitted the statutory fee award from his income.

14      On or about October 15, 2004, Bagley filed his 2003 IRS Form 1040, *U.S.*
15  *Individual Income Tax Return*. That return claimed the $27,244,000 qui tam award
16  as ordinary income and $9,070,520 of attorney's fees as a Schedule A deduction,
17  but failed to report the $8,990,520 of income from the Statuory Fee Award.
18  Bagley had concerns about filing the 2003 return as directed by Luce Forward,
19  because he believed the Statutory Fee award had to be included in income.

20      On or about May 10, 2005, Bagley filed a 2003 IRS Form 1040X, *Amended*
21  *U.S. Individual Income Tax Return*. On the Form 8275, *Disclosure Statement*, filed
22  with the amended return, it was explained that the return was being amended to
23  include the statutory attorneys' fees in income. Bagley's original 2003 income tax
24  return and first amended 2003 return were both signed under penalty of perjury, and
25  Bagley read the jurat clause on both the returns when he signed them.

26      On or about August 3, 2007, Bagley filed a second 2003 IRS Form 1040X,
27  *Amended U.S. Individual Income Tax Return*.

28          a.   On Bagley's second 2003 IRS Form 1040X, he reported

11

1   $36,651,295 as gross income—comprised of the $27,244,000

2   FCA Award and $9,407,295 Statutory fee—on a form Schedule

3   C, *Profit or Loss from Business*.

4   b.   Of the $36,651,295 gross income Bagley reported on the form

5   Schedule C, as included in his second amended 2003 tax return,

6   he paid a total of $18,477,815 to his attorneys. Those legal fees

7   were deducted on a Schedule C, Profit or Loss From Business.

8   For the 2003 tax year, Bagley paid federal income taxes and interest totaling

9   $10,363,241. On December 8, 2009, the IRS denied Bagley's claim for refund in

10   his second 2003 IRS Form 1040X.

11   The court makes the following credibility findings: The court found Bierman

12   and Bagley to be credible witnesses.   The government has noted that Bagley signed

13   tax returns under penalty of perjury while having concerns that they did not

14   accurately categorize the statutory fee or the other litigation fees and asks this court

15   to draw from it a negative inference regarding Bagley's credibility and truth-telling.

16   The court declines to do so, as the tax issues in this case are not clear-cut, and

17   Bagley's uncertainty and confusion about his tax obligations should not be

18   construed as obfuscation or lying.

19   If any of these findings of fact are more properly conclusions of law, they are

20   hereby incorporated in that part entitled "Conclusions of Law."

21   **CONCLUSIONS OF LAW**

22   **I.   JURISDICTION**

23   The court has jurisdiction over this action pursuant to 28 U.S.C. § 1346(a)(1)

24   and 26 U.S.C. § 7422(a). Venue in this court is proper under 28 U.S.C. §

25   1402(a)(1) since Bagley resides within this judicial district. All parties admit the

26   facts requisite to federal jurisdiction and venue.

27   **II.   BURDEN OF PROOF**

28   "A taxpayer seeking a tax refund bears the burden of proving that the

1  assessment was incorrect and proving the correct amount of the tax owed." *Ray v.*
2  *United States*, 762 F.2d 1361, 1362 (9th Cir.1985) *(citing Helvering v. Taylor*, 293
3  U.S. 507, 515, 55 S.Ct. 287, 291 (1935)). The burden of proving that a deduction
4  qualifies as an ordinary and necessary expense of a trade or business rests on the
5  taxpayer. *See INDOPCO, Inc. v. CIR*, 503 U.S. 79, 84-85 (1992).

6  **III.   FALSE CLAIMS ACT**

7       The FCA establishes liability for "[a]ny person" who "knowingly presents, or
8  causes to be presented, to an officer or employee of the United States Government .
9  . . a false or fraudulent claim for payment or approval.*" Vermont ANR v. United*
10 *States ex rel. Stevens*, 529 U.S. 765 (2000) (quoting 31 U.S.C. 3729(a)). The
11 defendant is liable for up to treble damages and a civil penalty of up to $10,000 per
12 claim. 31 U.S.C. § 3729(a). The Act authorizes both the Attorney General and
13 private persons to bring civil actions to enforce the Act. 31 U.S.C. § 3730. An
14 action brought by a private person under Section 3730(b) of the FCA is termed a
15 "qui tam" suit, and the person who brings such an action is referred to as a "relator"
16 or "informer." *Kelly*, 9 F.3d at 761. Various other terms have also been used by
17 courts to describe the role of the relator: "a private prosecutor," or a "private
18 attorney general.*" See Kelly*, 9 F.3d at 760; *see also United States ex rel. Milam v.*
19 *Univ. of Texas*, 961 F.2d 46, 49 (4th Cir. 1992) ("A *qui tam* relator is essentially a
20 self-appointed private attorney general, and his recovery is analogous to a lawyer's
21 contingent fee.").

22       The FCA is the government's "primary litigative tool for combating fraud"
23 against the federal government." *U.S. ex rel. Kelly v. Boeing Co.*, 9 F.3d 743, 745
24 (9th Cir. 1993) (quoting Senate Judiciary Committee, False Claims Amendments
25 Act of 1986, S.Rep. No. 345, 99th Cong. 2d Sess. 2 (1986), reprinted in 1986
26 U.S.C.C.A.N. 5266). Congress amended the FCA in 1986 to increase the financial
27 and other incentives for private individuals to bring suits under the Act and thereby
28 to enlist the aid of the citizenry in combating the rising problem of "sophisticated

1    and widespread fraud." *Id.* *(*citing S.Rep. No. 345 at 2, 23-24, reprinted in 1986

2    U.S.C.C.A.N. at 5267, 5288-89). The legislative history indicates that Congress

3    sought to encourage more private enforcement of the FCA because "detecting fraud

4    is usually very difficult without the cooperation of individuals who are either close

5    observers or otherwise involved in the fraudulent activity." *Id.* (citing S.Rep. No.

6    345 at 4, reprinted in 1986 U.S.C.C.A.N. at 5269). Further, Congress was also

7    concerned with the "lack of resources on the part of Federal enforcement agencies"

8    that often leaves unaddressed "allegations that perhaps could develop into very

9    significant cases." *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 963

10   (9th Cir. 1995) (citing S. Rep. No. 345, 99th Cong., 2d Sess. 2-3 (1986), reprinted in

11   1986 U.S.C.C.A.N. 5266, 5272).

12        The financial incentives for relators under the FCA are scaled depending on

13   the contribution of the relator. As stated by the Ninth Circuit in *Green*, "[a] relator

14   who properly brings a claim will generally receive a share of the recovery as well as

15   eligibility for attorneys' fees and costs. This is true even if the government decides

16   to intervene and prosecute the action itself, or elects to pursue its claim in an

17   administrative proceeding. The right to recovery clearly exists primarily to give

18   relators incentives to bring claims. Moreover, the extent of the recovery is tied to

19   the importance of the relator's participation in the action and the relevance of the

20   information brought forward. This demonstrates not only the importance of the

21   incentive effect, but that Congress wished to create the greatest incentives for those

22   relators best able to pursue claims that the government could not, and bring forward

23   information that the government could not obtain." *Green*, 59 F.3d at 963-64.

24   Further, "[p]roviding the relator a right to recover . . . also serves the additional

25   purpose of giving a relator the incentive to 'act as a check that the Government does

26   not neglect evidence, cause undu[e] delay, or drop the false claims case without

27   legitimate reasons.'" *See id.* (quotations and citations omitted). In cases in which

28   the government chooses to prosecute the action, the relator will receive "at least 15

14

percent but no more than 25 percent of the action or settlement of the claim,
depending upon the extent to which the person *substantially contributed* to the
prosecution of the claim."  3730(d)(1) (emphasis added).

Bagley received a qui tam award of $27.7 million, which was 24.5% of the
FCA Settlement paid by TRW.  Bagley's award was very near the highest
percentage award possible for a relator in a qui tam action in which the government
has intervened.  From that award, the court concludes that Bagley made a very
substantial contribution to the prosecution of the claim and that the government
itself found Bagley's contribution- both the information he provided and also the
filing of and dogged pursuit of his two FCA lawsuits- to be meaningful.

The government points out that Bagley did not immediately disclose to it the
fraudulent claims when he first found out about them, that he only did so after not
finding any further employment, that he removed documents from TRW in violation
of his employment contract, and that he sought immunity from criminal prosecution
by the federal government prior to litigating the FCA lawsuit.  The court does not
find these facts overall diminish the substantial contribution made by Bagley to the
FCA lawsuits.  In fact, Congress was well-aware that it needed to rely on people
who may have been involved in the fraudulent claims, to be able to uncover the
schemes. *Kelly v. Boeing Co.*, 9 F.3d at 745 (citing S.Rep. No. 345 at 4, reprinted in
1986 U.S.C.C.A.N. at 5269) ("detecting fraud is usually very difficult without the
cooperation of individuals who are either close observers or otherwise involved in
the fraudulent activity").

## IV. SECTION 162 TRADE OR BUSINESS DEDUCTION

The issue in this case is whether Bagley must include his income from the *qui tam* lawsuits as "other income" on his 2003 federal tax return and deduct the attorneys fees on Schedule A, as he did on his first amended return, or whether he can properly report the *qui tam* award on Schedule C and deduct his attorney fees as ordinary and necessary business expenses, as he did in his second amended return.

26 U.S.C. § 162(a) provides a deduction for all "ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business." Therefore, in order for Bagley to succeed on his claims, he must establish that his attorneys' fees qualified as "ordinary and necessary expenses" paid or incurred during the taxable year in carrying on a "trade or business." *See id.* While there is a wealth of case law concerning what constitutes a trade or business under Section 162(a), and also whether litigation fees are appropriately considered a business expense, the precise issue confronted here regarding the characterization of a *qui tam* relator's award and litigation fees he or she incurred while pursuing that claim under Section 162(a) appears to be one of first impression.

Before the court analyzes whether Bagley has shown that his activity as a relator in a *qui tam* action is a business and the expenses associated with the lawsuits were ordinary and necessary business expenses, it must first ascertain what

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

is the proper test to apply to make that determination. Bagley contends that this court should apply the standard set forth in case law for determining whether Bagley's activities as a qui tam relator were a "trade or business" and whether the litigation fees were "ordinary and necessary" under Section 162(a).  On the other hand, the government asserts that the court must apply the "origin of the claim" test, which is a judicially-created test to determine whether the origin and character of the claim with respect to which the litigation expense was incurred was a business or personal expense under Section 162.

These tests are merely different methods of analyzing whether a taxpayer's litigation expenses have been incurred on behalf of a trade or business, but they approach the issue differently, one where the focal point is the nature of the taxpayer's activity itself and one where the focal point is the nature of the litigation. Therefore, the court will apply both to determine the character of Bagley's litigation expenses.

### A.  Trade or Business Test

While there is no statutory definition of the term "trade or business" as used in Section 162(a), the Supreme Court has stated that the words are "broad and comprehensive," and that the determination of whether a taxpayer is carrying on a trade or business "requires an examination of the facts in each case." *Groetzinger*,

17

480 U.S. at 36.  To be engaged in a "trade or business" for purposes of Section 162(a), the taxpayer must be involved in the activity with continuity and regularity, and the taxpayer's primary purpose for engaging in the activity must be for income or profit.  *Comm'r v. Groetzinger*, 480 U.S. 23, 35 (1987); *see also Independent Elec. Supply, Inc. v. Comm'r*, 781 F.2d 724, 726 (9th Cir. 1986) (holding that, for a particular activity to constitute a trade or business, the activity must be undertaken or continued in "good faith, with the dominant hope and intent of realizing a profit").

### 1.  *Profit motive*

"[T]he primary inquiry when determining whether a particular activity constitutes a trade or business is to ask whether the activity was undertaken or continued 'in good faith, with the dominant hope and intent of realizing a profit, *i.e.* taxable income, therefrom.  In other words, the 'basic and dominant' motive behind the taxpayer's activities must be to make a profit or income from those very same activities." *Independent Elec.*, 781 F.2d at 726 (quotation marks and citations omitted).  With regard to FCA lawsuits in general, the incentive system set up by Congress is designed to encourage people to disclose information to the government and file lawsuits based on the potential reward or "bounty" they may receive; therefore, fostering a profit motive in a potential relator seems to have been

Congress's intent. *See Kelly*, 9 F.3d at 760 ("Indeed, the only private interest at stake in a qui tam action is the interest which Congress has created in a reward for successful prosecution."); *see also United States ex rel Lu v. Ou*, 368 F.3d 773, 775 (7th Cir. 2004) (the relator is a volunteer whose motive is a private one, seeking the monetary award from the suit); *see also Vermont Agency*, 529 U.S. at 776-77 (a relator's interest in the suit is the bounty he will receive if the suit is successful).

While it is possible that other relators may disclose information to the government and later assist in the prosecution of a FCA lawsuit for other motivations, Bagley credibly testified at trial that he performed these services "in order to successfully prosecute the claims so that [he] would receive an award." (Tr. 2 87:7-9), and the court finds that he was so motivated, just like other relators may be in pursuing FCA claims, by the potential FCA award.[2/] "Unquestionably, . . .

---

[2/]Bagley may be able to deduct litigation fees on Schedule C of his 1040 tax return for 2003 as a nonbusiness itemized deduction under Section 212, if the income-producing activity he was engaged in as a relator was found not to involve a trade or business. In the case of an individual (as opposed to a trade or business), 26 U.S.C. § 212 provides that a deduction is allowed for the ordinary and necessary expenses paid or incurred during the taxable year for, *inter alia*, the production or collection of income. In *Guill v. Comm'r*, 112 T.C. 325, 328-29 (1999), the Tax Court explained the difference in deductibility of legal expenses as trade or business expenses on Schedule C for Section 162(a), or as expenses for the production of income for an individual on Schedule A for Section 212. Section 162(a) "allows an individual to deduct all of the ordinary and necessary expenses of carrying on his or her trade or business" and thus "governs the deductibility of litigation costs as a business expense", whereas Section 212 "governs the deductibility of litigation costs as an itemized deduction when the costs are incurred as a nonbusiness profit-

.in this circuit the rule is that a taxpayer's venture is a trade or business if he has a good faith expectation of profit from that venture, irrespective of whether or not others might view that expectation as reasonable." *Mercer*, 376 F.2d at 710-11.

While the focus of the test is on the subjective intention of the taxpayer, objective indicia may be cited to establish the taxpayer's true intent. *See Independent Elec. Supply*, 781 F.2d at 726.   Treasury Regulation 1.183-2(b) lists factors to consider when ascertaining whether a tax payer had the requisite profit motive to be considered engaged in a trade or business. "The number of factors for or against the taxpayer is not necessarily determinative, but rather all the facts and circumstances must be taken into account, and more weight may be given to some factors than to others." *See id.*

The factors under Treasury Regulation section 1.183-2(b) that are relevant to the inquiry into Bagley's profit motive are: (1) the manner in which he carried on his FCA prosecution activity; (2) the expertise of Bagley and his advisors; (3) the

---

seeking expense." *Id.* at 328.  Sections 162(a) and 212 are "considered *in pari materia*, except for the fact that the income-producing activity of the former section is a trade or business, whereas the income-producing activity of the latter section is a pursuit of investing or other profitmaking that lacks the regularity and continuity of a business." *Id.*  As the government in this case is contending that Bagley's expenses are appropriately filed under Section 212, it appears as if they concede that Bagley had a profit motive, and instead are contesting the "regularity and continuity" of the income-producing activity by Bagley, in this case his disclosure of information and subsequent investigation and preparation of the FCA lawsuit.

time and effort expended by Bagley; (4) the success of Bagley in carrying on similar activities; (5) Bagley's history of income or losses with respect to the FCA prosecution activity; (6) the amount of occasional profits earned; (7) the financial status of Bagley while he carried on his FCA prosecution activity; and (8) any element of personal pleasure or recreation.

### a.  Prosecuting FCA suits in a business-like manner

From 1994 to 2003, Bagley personally spent 5,963 hours investigating and prosecuting the FCA claims.  He maintained detailed contemporaneous time logs on a daily basis reflecting the time he had spent on the litigation.  He actively participated in the FCA prosecution from its inception, by attending meetings with his attorneys and with the government representative, reviewing documents, creating written summaries of information, drafting and editing pleadings and filings, creating damage calculations, and providing guidance to his attorneys about regulations and pricing.  While Bagley was not an attorney on the FCA lawsuits, Bagley conducted himself in much the same manner as a lawyer would when litigating a lawsuit.  In fact, Bagley identified himself as a "Private Attorney General" on his 2003 IRS Form 1040.

### b. Expertise of Bagley and his Private Counsel

If Bagley's business was that of a private attorney general prosecuting a FCA

claim relating to fraudulent schemes at TRW, there was likely no one else with more

relevant expertise to conduct such a business.  He worked for TRW from 1967

through 1993, and he was an expert concerning TRW's systems, procedures,

personnel and culture.  Bagley was also exceedingly knowledgeable about the FAR,

the accounting rules that relate to the cost pools, and the pricing provisions of

government contracts and claims settlement procedures.  Equally important

expertise to guide his investigation and preparation of the FCA lawsuits was his

first-hand knowledge of the fraudulent schemes, and the identity of relevant

witnesses and the location of documentary evidence.  His employment background

with TRW not only provided him with the knowledge of those fraudulent schemes,

which he could impart to the government as an informant, but also the ability to

conceptualize the FCA lawsuits and to assemble the evidence together necessary to

prove those claims.

    The size and amount of the FCA award given to Bagley by the government

makes it clear that it found his expertise vital to the prosecution of these claims.

Bagley's expertise was not only because of the nature of the information he

provided to the government, as the government argues now, but rather in how he

used his background and skills to facilitate that information being used effectively

in the FCA lawsuits, as the government recognized at the time of the settlement of

1  those lawsuits.

2
3      The government contends that Bagley's expertise is consistent with an insider
4  who helped perpetrate TRW's false claim schemes, and not with that of someone
5
6  engaged in a trade or business. However, that view of Bagley's activities is focused
7  on the wrong time frame. While it is true that Bagley knew about the fraudulent
8  claims made by TRW and did not immediately act, the issue is whether the
9
10 information he learned through that time period provided him with peculiar
11 knowledge and skills that were relevant to a trade or business.  The court finds it
12
13 did, because the relevant trade or business in this case is not, as the government
14 repeatedly argues, simply the act of informing or disclosing to the government the
15 information that he had. It was also the assistance in investigating and litigating the
16
17 case that he provided to the government. Therefore, the court finds the
18 government's argument that "Bagley's unanticipated involvement in complex and
19
20 intensive litigation did not transform his whistleblowing or informant activity into a
21 trade or business" to be both factually inaccurate and legally incorrect. First,
22
23 Bagley did anticipate involvement in complex and intensive litigation when he
24 began investigating and speaking with the government about his claim. Second, his
25 involvement in the complex litigation was part and parcel of the business Bagley
26
27 was conducting for approximately nine years.

28

Finally, Bagley's counsel's expertise must be considered as well, because Treasury Regulation 1.183-2(b)(2) takes into account not only the expertise of the taxpayer, but also that of "his advisors."   Bierman and his law firm, Tuttle & Taylor, had significant experience with prior FCA litigation.  Later in the litigation, Bagley also brought in a second law firm that specialized in FCA lawsuits, Phillips and Cohen.

### c.  The time and effort expended by Bagley

Bagley and his counsel expended a considerable amount of time and effort in prosecuting the two FCA suits. Bagley himself personally worked 5,963 hours on the FCA investigation and prosecution.  His efforts, as have already been discussed, were extensive, thorough, and a substantial contribution to the government's efforts in litigating the FCA lawsuits.  "The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." *See* Treas. Reg. 1.183-2(b)(3).

Furthermore, the time expended in carrying on the trade or business can be measured by the total time commitment by both the taxpayer and "competent and qualified persons employed by the taxpayer" to carry on the activity. *See id.* Bagley's private counsel worked an additional 21,054 hours on the FCA lawsuit

24

litigation.  The total of Bagley's efforts and his counsel show that a tremendous amount of time and effort went into this enterprise.

### d. The success of Bagley in carrying on similar activities

Bagley urges the court to consider his prior experience with investigation of false claims by TRW to the government which occurred while he was an employee at TRW, as evidence of his success in carrying on similar activities.  While the court finds that this fact is helpful in understanding Bagley's investigation and prosecution of the FCA claims, it is more relevant with regard to his expertise, and not with regard to his success in carrying out similar activities.  Although Bagley did investigate those claims during his tenure at TRW and they resulted in voluntary disclosures to the government, Bagley was not involved in the prosecution or litigation of a lawsuit, which is the bulk of the business activity alleged here.  Furthermore, that investigation did not lead to any profit.  *See* 26 C.F.R. § 1.183-2(5) ("The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit. . .").

Therefore, while not discounting this factor entirely, the court gives it minimal weight.

### e. Bagley's history of income or losses with respect to the FCA prosecution activity and the amount of occasional profits earned

25

Bagley's income from the FCA prosecution activity was a single pay-out of $36,651,295 in 2003. While Bagley did not incur a monetary loss during the time period he prosecuted the FCA activity of TRW and he did not pay for significant expenses attributable to such prosecution, he was at financial risk because, under the FCA, Bagley could have been liable to TRW for its costs and attorney's fees if TRW could establish that the suits were frivolous. *See* 31 U.S.C. § 3730(d)(4). The government's contention that a one-time pursuit of a FCA award with a single-payout, which had no income stream through 2002, is not indicative of a business has been rejected by the courts with regard to other activities. *See Ellsworth v. Comm'r*, 21 T.C.M. 145, 150-51 (1962) (finding a trade or business existed even though it would take the taxpayer 15 years to generate a profit); *Snyder v. U.S.*, 674 F.2d 1359, 1363 (10th Cir. 1982) (a taxpayer could be in a trade or business of producing a book even though he had not yet finished the product or generated a profit).

26 C.F.R. 1.183-2(7) itself also instructs that "substantial profit, though only occasional, would generally be indicative that an activity is engaged in for profit, where the investment or losses are comparatively small. Moreover, an opportunity to earn a substantial ultimate profit in a highly speculative venture is ordinarily sufficient to indicate that an activity is engaged in for profit even though losses or

1   only occasional small profits are actually generated."   While the court is mindful

2
3   that many businesses will perhaps generate profits on a more continuous, regular

4   basis, there are some enterprises that will bear the indicia of a trade or business, but

5
6   will also be a riskier venture with a higher potential pay-out and more significant

7   risk.  Bagley's business of prosecuting a FCA lawsuit was just such a venture.

8            *f.  Bagley's financial status while he carried on his FCA prosecution*
9
10           *activity*

11           Bagley was not otherwise employed and worked exclusively on the FCA

12
13  litigation during the 1994-2003 time period.  While it is not necessary for a taxpayer

14  to devote himself completely to an enterprise for it to qualify as a trade or business,

15
16  *see, e.g., Mercer v. Comm'r*, 376 F.2d 708, 709-10 (9th Cir. 1967), the court

17  concludes from the fact that he did devote himself to it entirely that Bagley had a

18  profit motive, as he was not generating any other income at the time.  26 C.F.R. §
19
20  1.183-2(8) ("The fact that the taxpayer does not have substantial income or capital

21  from sources other than the activity may indicate that an activity is engaged in for

22
23  profit.").

24           *g.  Elements of personal pleasure or recreation*

25           There is no evidence that the FCA litigation was a hobby or an activity that
26
27  brought Bagley personal pleasure or recreation.  As he testified at trial, it was an

28

27

1    emotionally and physically grueling experience.

2

3         Therefore, based on the foregoing, the court concludes that Bagley's profit

4    motive in being a relator and engaging in the prosecution of the FCA litigation from

5

6    1994 to 2003 is supported by substantial evidence.

7    **2.  *Regularity and continuity***

8

9         Even where the taxpayer engages in the FCA activity primarily for profit,

10   such activity does not automatically constitute a "trade or business" under section

11   162(a): "[a] taxpayer can show that his activities are a 'business' by demonstrating

12

13   that he devotes a substantial period of time to the activities, or that there has been

14   extensive or repeated activity over a substantial period of time." *Snyder v. U.S.*, 674

15

16   F.2d 1359, 1364 (10th Cir. 1982) (citations omitted).   The Supreme Court's

17   analysis in *Groetzinger* of gambling as a trade or business is illuminating in this

18

19   regard:

20        "[I]f one's gambling activity is pursued full time, in good faith, and with

21   regularity, to the production of income for a livelihood, and is not a mere hobby, it

22

23   is a trade or business within the meaning of the statutes with which we are here

24   concerned.   Respondent Groetzinger satisfied that test in 1978.   Constant and large-

25   scale effort on his part was made.   Skill was required and applied.   He did what he

26

27   did for a livelihood, though with a less-than-successful result.   This was not a hobby

28

or a passing fancy or an occasional bet for amusement." *Groetzinger,* 480 U.S. at 35-36.

It is indisputable that Bagley's activity as a relator occurred over a substantial period of time, and during that time period, Bagley devoted much of his time and energy to the tasks and responsibilities of investigating and litigating the FCA lawsuit.  He pursued the FCA lawsuit "full time, in good faith, and with regularity," by performing a multitude of tasks: attending meetings, reviewing documents that had been produced, creating and revising documents (memoranda, summaries, and court filings), doing damage calculations, and generally assisting his attorneys and the government in understanding the nature of the fraudulent claims and where they could find the documents and witnesses necessary to effectively litigate the case. This was not a hobby or an activity Bagley engaged in for pleasure or amusement.

It is clear that skill was required and applied by Bagley as a relator.  Bagley was skilled as an accountant, had an in-depth understanding of TRW's accounting system and the method by which they perpetrated their fraudulent claims, and knew what was necessary to understand how the frauds occurred and where the evidence was.  Applying the standard set forth by the Supreme Court in *Groetzinger*:  As "[Bagley's relator] activity is pursued full time, in good faith, and with regularity, to the production of income for a livelihood, and is not a mere hobby, it is a trade or

business within the meaning of the statutes with which we are here concerned." 480 U.S. at 35-36.

The government contends that Bagley's one-time pursuit of a FCA award was not performed with frequency and that he never replicated his activity, and therefore his FCA activity does not meet the "common-sense perception of a trade or business." However, the standard elucidated by the Supreme Court and the Ninth Circuit does not require that Bagley be engaged in a business activity that repeats with frequency.   In fact, courts have recognized long projects with only one pay-out as a trade or business. *See Ellsworth v. Comm'r*, 21 T.C.M. 145, 150-51 (1962) (finding a trade or business existed even though it would take the taxpayer 15 years to generate a profit).   Instead, the work involved in the enterprise (whether that enterprise be a singular project with one goal, or a business with a product or skill used frequently) must be done with frequency and must be pursued with regularity. Bagley, over the course of nine years while litigating the FCA lawsuits, pursued those lawsuits and engaged in the activities necessary to litigate those lawsuits with frequency and regularity.

The crux of the problem with the government's argument is contained in its assertion that "[t]he litigation activities in which Bagley took part do not entitle him to different tax treatment than a similarly-situated plaintiff who, by mere

30

1
2
3   happenstance, encounters an opponent who is not adverse and settles shortly after
4   the filing of the suit." Defendant's Proposed Findings of Fact and Conclusions of
5   Law at 33. However, Bagley's litigation activities, and the regular, continuous way
6   he undertook them combined with skill and a good-faith effort to make a profit, are
7   precisely what may distinguish him from other relators, who have not pursued their
8   FCA disclosure and investigation in the same manner. If a relator's FCA lawsuit
9
10  quickly settled, then he did not engage in the type of regular and continuous efforts
11  that characterize a trade or business.
12
13      Finally, although the Supreme Court has rejected the notion that a taxpayer is
14  required to provide goods or services to be engaged in a trade or business, it has
15  acknowledged that providing goods and services usually would qualify an activity
16
17  as a trade or business under Section 162(a). *Groetzinger*, 480 U.S. at 34. Qui tam
18  relators provide services to the government. *United States ex rel. Kelly*, 9 F.3d at
19
20  745; *see also Alderson v. United States*, 718 F. Supp. 2d 1186, 1190-91 (C.D. Cal.
21  2010) ("In short, the overwhelming weight of the case law holds that a False Claims
22
23  Act qui tam award is given in exchange for information and services . . . . The qui
24  tam award . . . is based entirely on the relator's information and personal efforts . . .
25  A bounty is defined as a payment given to induce someone to take action or perform
26
27  a service, and a reward is defined as a payment given in return for services. . . or
28

31

information.") (internal citations and quotation marks omitted).  And, the financial

incentive structure Congress created for relators who bring *qui tam* suits is scaled

depending on the level of both services and information the relator provides.

*Alderson*, 718 F. Supp. 2d at 1190 ("The range between 15 and 25% distinguishes

between a relator that simply provided information and a relator that provided

significant services to the litigation effort.").  In this case, this court concludes that

the evidence clearly supports a finding that, in addition to coming forward with the

false claims information and filing the FCA lawsuits, Bagley provided services to

the government, including, *inter alia*, drafting memoranda and summaries

explaining the false claims schemes by TRW, reviewing documents produced to

TRW, doing damages calculations, and explaining the evidence and claims to the

government.

Based on the foregoing, the court concludes that Bagley has met his burden

of proof to show that his activities as a relator from 1994 to 2003 were a "trade or

business" for purposes of Section 162(a).

**B.   Ordinary and necessary expenses**

The next step in the analysis is to determine whether Bagley's litigation

expenses were "ordinary and necessary expenses paid or incurred during the taxable

year in carrying on" his trade or business.  The Supreme Court has interpreted the

term "ordinary and necessary" as used in Section 162(a) to mean "appropriate" and "helpful". *Comm'r v. Tellier*, 86 S.C. 1118, 1120 (1966).  The Ninth Circuit has explained further: "The term 'necessary' imposes 'only the minimal requirement that the expense be 'appropriate and helpful' for the 'development of the [taxpayer's] business," and "an 'ordinary' expense must be related to a transaction 'of common or frequent occurrence in the type of business involved.'" *Smith v. C.I.R.*, 300 F.3d 1023, 1029 (9th Cir. 2002)(citations omitted).

Bagley was engaged in the business of prosecuting FCA lawsuits and providing services to the government in that prosecution.  In the course of the litigation, Bagley paid a total of $18,477,815 to his attorneys.  These legal fees were necessary for the development of the business because, in order to successfully pursue a FCA suit as a relator, the relator must retain a licensed attorney.  *See Schwartz*, 118 F. Supp. 2d 1991.  Without hiring an attorney, Bagley could not have engaged in his business.  For the same reason, litigation fees are an ordinary expense when engaged in litigating a FCA lawsuit, because the very nature of the business requires their expenditure.

## IV.   ORIGIN AND NATURE OF THE CLAIM

When confronted with the issue of whether litigation fees are appropriately deducted as a business expense under Section 162(a), courts have developed the

"origin of the claim" standard: "[t]he origin and character of the claim with respect to which an expense was incurred, rather than its potential consequences upon the fortune of the taxpayer, is the controlling basic test of whether the expense was 'business' or 'personal' within the meaning of § 162." *Comm'r v. Tellier*, 383 U.S. 687, 689 (1966)(finding that litigation costs of an individual charged criminally for securities fraud were deductible under 26 U.S.C. § 162(a) because the defense of the action stemmed from the taxpayer's securities business activity); *see also United States v. Gilmore*, 372 U.S. 39, 49 (1963) ("the characterization as 'business' or 'personal' of litigation costs . . . depends on whether or not the claim arises in connection with the taxpayer's profit-seeking activities"); *Lykes v. United States*, 343 U.S. 118, 125 ("Legal expenses do not become deductible as business expenses merely because they are paid for services which relieve a taxpayer of liability").

The underlying "claim", the origin of which is to be identified, is not the tax claim, but the underlying claim that gave rise to the incurring of expense or income. *Keller St. Dev. Co. v. Comm'r*, 688 F.2d 675, 680 (9th Cir. 1982). In *Gilmore*, which involved divorce litigation over a wife's claim to community property assets, the main issue in the divorce proceedings was the disposition of the husband's controlling interests in three corporations. 372 U.S. at 624. The husband argued that his primary purpose in vigorously litigating the divorce was to protect his

capital interest in the corporations, and therefore it was a business expense. The Supreme Court found that the claim was the dispute over the community property assets, and the litigation expenses arising from that claim were attributable to a purely personal reason (the community property). *See id.* at 631. Therefore, the expenses were not deductible.

The government here contends that the role of a relator in a *qui tam suit* is that of an informer who provides information in return for a reward, and the relator's contribution to the litigation of *qui tam* actions is no different from other types of informants whose value to the action is commensurate with the extent of their inside information. According to the government, because the court must look only at the underlying origin and character of the activity which gave rise to the claim, it is only the activity of being an informant– not the *qui tam* relator's efforts during trial– that is relevant to determining what the origin of the claim here is.

On the other hand, Bagley contends the underlying claim is the fraud perpetrated on the government that Bagley disclosed, and that Bagley's litigation expenses were business expenses because they were proximately related to Bagley's FCA prosecution activity from a trade or business. Bagley contends that he does not have a personal stake in the damages sought, all of which were suffered by the government, and that, as a relator, he acts as a private attorney general or the agent

35

of the government.

The court concludes that the underlying claim here is the *qui tam* action, and the origin of the *qui tam* action was Bagley's initial disclosure of the fraud and all the subsequent actions he took to bring and successfully prosecute the FCA claim. The gravamen of a FCA suit is fraud against the government, and the relator effectively stands in the shoes of the government to prosecute the FCA claim. *See United States ex rel. Barajas*, 147 F.3d at 910 ("There is only one claim, the government's pursuable either by the qui tam relator on behalf of the government, or by the government on its own behalf . . ."). In doing so, the relator acts as an agent or private attorney general for the government, and is provided an award for the "information and services" provided while prosecuting that claim. *See Alderson*, 718 F. Supp. 2d at 1188 ("The overwhelming weight of the case law holds that a False Claims Act *qui tam* award is given in exchange for information and services."). Therefore, this was not a personal claim of Bagley's that he was prosecuting. *See Barajas*, 147 F.3d at 910; *Milam*, 961 F.2d at 49 ("The relator has no personal stake in the damages sought– all of which, by definition, were suffered by the government"). The services provided by Bagley, from the initial disclosure through the investigation and filing of the FCA lawsuits, have the indicia of a business enterprise. The government's assertion that Bagley's initial disclosure, or

informing, on the government is the origin of the claim flies in the face of the FCA's view of the role of a relator. The relator is not simply an informant, as the FCA encourages relators to be more than that, by taking an active role in investigating the fraud and filing a lawsuit. *Green*, 59 F.3d at 963-64.

The cases cited by the government to support the proposition that qui tam litigation expenses are personal are distinguishable. First, in *Green v. Comm'r*, 507 F.3d 857 (5th Cir. 2007), aff'g T.C. Memo 2005-520, Green was awarded tort damages after he won a lawsuit for retaliatory termination. Green had difficulty collecting on the personal judgment , and he created two business entities to run his litigation efforts at collection of the judgment. He later attempted to claim those litigation expenses as business expenses, and the Fifth Circuit held that creating a business entity to run expenses through it does not convert collection attempts on a personal judgment into a business one. The facts in *Green* are inapposite to the facts of the case at hand. Bagley was engaging in a FCA prosecution activity and providing services to the government, not attempting to collect on a personal tort judgment. Therefore, the court concludes that *Green* does not apply to this case.

*Campbell v. Comm'r,* 134 T.C. 20 (2010), aff'd 658 F.3d 1255 (11th Cir. 2011), is also not applicable here. In *Campbell*, the Tax Court held that taxpayers were entitled to deduct *qui tam* attorney's fees as miscellaneous itemized deductions

on Schedule A of their income tax returns.  134 T.C. at 27.  However, in that case, the court never addressed the question of whether those legal expenses, under certain circumstances, could be considered ordinary and necessary expenses for a trade or business, deductible on Schedule C.

Based on the foregoing, the court holds that the litigation expenses incurred by Bagley in pursuing his FCA lawsuit as a qui tam relator, may be deducted as ordinary and necessary business expenses incurred for a trade or business.

## CONCLUSION

Accordingly, the court concludes that (a) Bagley was engaged in the trade or business, within the meaning of Section 162(a), of prosecuting a FCA lawsuit against TRW, (b) Bagley incurred and paid necessary and ordinary business expenses in the amount of $18,477,815 related to that trade or business, and (c) Bagley is entitled to a refund of federal income taxes paid in the amount of $3,874,407 plus interest as allowed by law, with regard to his 2003 tax year.

Dated:  August   5, 2013                               ROBERT J TIMLIN
                                        _____

                                          HON. ROBERT J. TIMLIN
                                          UNITED STATES DISTRICT JUDGE

38